[No. 1880]

# THE STATE OF NEVADA, Respondent, *v.* ASCENSION MANGANA, Appellant.

1. HOMICIDE—"MURDER IN THE FIRST DEGREE"—STATUTES.

    Section 17 of the crimes and punishments act (Comp. Laws, 4672), making all murder by poison, lying in wait, or torture, or any other kind of wilful, deliberate, and premeditated killing, or committed in the perpetration or attempt to perpetrate any arson, rape, robbery, or burglary, murder in the first degree, does not create separate statutory homicides, but the killing of a human being in either one of the methods described is "murder in the first degree," and a felony and a homicide committed in perpetrating or attempting to perpetrate a felony constitute together the one crime of murder in the first degree.

2. HOMICIDE—INDICTMENT—MURDER IN THE FIRST DEGREE.

    Under section 17 of the crimes and punishments act (Comp. Laws, 4672), making all murder by poison, lying in wait, or torture, or any other kind of wilful, deliberate and premeditated killing, or that committed in the perpetration or attempt to perpetrate any robbery or other enumerated felony, murder in the first degree, and under an indictment charging a killing with malice aforethought, accused may be convicted of either wilful, deliberate, and premeditated killing, or of a killing committed in the perpetration of a robbery, whether wilful, deliberate, and premeditated or not; but if the indictment should allege that a killing was committed in the perpetration of a robbery, and the evidence should indicate that the killing was premeditated, but not in the perpetration of robbery, the variance would be fatal.

3. HOMICIDE—MURDER IN THE FIRST DEGREE—EVIDENCE—SUFFICIENCY.

    Evidence *held* to justify a conviction of murder in the first degree either on the ground that the killing was done wilfully, deliberately, and premeditatedly, or on the ground that it was committed in the perpetration of a robbery.

4. HOMICIDE—HOMICIDE IN COMMISSION OF OTHER OFFENSE—PRE-
    SUMPTIONS.

   A killing committed in the perpetration of a robbery is pre-
   sumed to have been wilful, deliberate, and premeditated.

5. HOMICIDE—INDICTMENT—SUFFICIENCY.

   An indictment for murder committed in the perpetration of
   a robbery may be charged in the same manner as ordinary
   murders are charged, and it need not be alleged that the mur-
   der was committed in the perpetration of a robbery in order
   to admit testimony showing that a robbery was committed in
   addition to the killing.

6. CRIMINAL LAW—TRIAL—INSTRUCTIONS—ASSUMPTION OF FACT.

   Where accused by his own testimony admitted that he fled
   from the scene of the murder, and his counsel, in his opening
   statement, admitted the same fact, it was not improper for the
   court in its instructions to assume that there was evidence of
   flight.

7. CRIMINAL LAW—HARMLESS ERROR—ERRONEOUS ADMISSION OF
    EVIDENCE.

   Where accused, on trial for murder perpetrated in the com-
   mission of a robbery, admitted that he was in possession of a
   watch of decedent, and sought to excuse his possession, the
   error, if any, in admitting evidence as to the number of the
   watch of decedent, was harmless.

8. CRIMINAL LAW—PARTIES—LIABILITY.

   No distinction exists between an accessory before the fact
   and a principal, or between principals in the first and second
   degree in cases of felony, and all persons concerned in the com-
   mission of a felony, whether they deliberately commit the
   offense or merely aid and abet in its commission, though not
   present, are properly indicted, tried, and punished as princi-
   pals.

9. CRIMINAL LAW—APPEAL—INSTRUCTIONS—REVIEW.

   The action of the court in failing to charge on matters will
   not be reviewed on appeal, where it does not appear that
   instructions were requested or that any exception was taken
   in regard thereto.

10. CRIMINAL LAW—APPEAL—EVIDENCE—REVIEW.

    Under section 421 of criminal practice act (Comp. Laws,
    3995), authorizing exceptions to the admission or rejection of
    testimony, the particular ground of an objection or exception
    to the admission of evidence must be stated in order to make
    the ruling reviewable on appeal.

APPEAL from the District Court of the Fifth Judicial
District of the State of Nevada, Nye County; *Mark R.
Averill*, Judge.

Ascension Mangana was convicted of murder in the
first degree, and he appeals.    **Affirmed.**

## STATEMENT OF FACTS

The defendant was tried under an indictment, the charging part of which follows: "The said Ascension Mangana, the defendant above named, at Leeland, in the county of Nye, State of Nevada, on or about the 15th day of June, A. D. 1909, and before the finding of this indictment, without authority of law, and with malice aforethought, then and there killed one Byron Nelson, a human being, by then and there stabbing the said Byron Nelson with a sharp instrument, the character of which being unknown to the said grand jury." The jury brought in a verdict of murder in the first degree and fixed the punishment at death.

The following are the principal facts as claimed by the state:

Bryon Nelson conducted a little saloon in Leeland, Nevada, and had a partner or associate named Richard Stillwell, and Nelson was in the habit of cashing the checks of the different employees of the railroad on paydays. On June 15, 1909, which was payday at Leeland for the section hands on the railroad, Nelson did not cash them, for the reason that the station agent or an employee of the railroad had in his possession sufficient money to cash the checks of the other employees. The defendant and an associate of his, Ochoa, who worked with him as a section hand on the railroad, were aware that Nelson on payday nights had sufficient money in the till to cash a number of checks, and that on this payday he did not cash the checks, and consequently had the money on hand, and had other money which was paid in that evening upon previous accounts and for drinks. The defendant and Ochoa and others were in the saloon drinking that night. The defendant and Ochoa remained with Nelson and Stillwell until after the others had gone, and the saloon remained open later than usual and until about midnight.

The next morning the body of Nelson was found near the bar and door, and that of Stillwell ninety feet away from the saloon and partly under a wagon. The former

had been stabbed in the throat and chest five times, and the latter in the throat and chest and back four times. There were numerous tracks overlapping each other and blood from the wounds at the place where Stillwell's body lay, and no blood was found between there and the saloon. His shoes were on his feet, unlaced, without his stockings. Only the top button of his trousers was fastened, and his suspenders were hanging down loose. The till was found open, and nothing remaining in it but a five-cent piece and a crumpled five-dollar bill. With the exception of a cent piece upon the bar, no other money was found. Nelson's watch, which had been fastened to his suspender by a chain, had been jerked off and was missing, and the watch ring which had been fastened to the watch was found at his side.

One of the men working on the section testified that after he had gone to bed in the bunkhouse that night he heard somebody say that they had got into trouble and would have to leave. The next morning the defendant and his companion, Ochoa, were missing and not to be found. Wages for half a month were due them and unpaid at the time they left. The tracks of the two men were found, and were turned and made so as to elude pursuers. After two days and a night the defendant was captured at Amargosa, a little after dark, in a store where he had gone to purchase crackers, canned corn, and tomatoes. His own watch, knife, pistol, and a few dollars in money were taken from him at the time he was arrested. The next morning he threw away and made an effort to conceal the watch which had been taken from the body of Nelson.

The defendant, a Mexican about 20 years of age at the time of the killing, and not speaking English much, if any, relying upon his own testimony, claimed on the trial that he returned from work upon the section after 5 o'clock on the evening of the 15th, received a check for his wages for the previous month, cashed it at the railroad office, and after paying a grocery bill had his dinner and was in the saloon in the company of some of the

other section hands, drinking; that later in the evening
he left the saloon with another railroad laborer, Tomas
Gutierrez, and went with him to the bunkhouse; that they
went to bed in their respective rooms; that later in the
evening he was awakened by Ochoa, who was in the
saloon when he left about 10 o'clock, and who at the
time he awakened him had a knife and commanded him
to keep quiet and to get up and come with him; that he
arose, put on his clothes, and followed Ochoa; that he
had a pistol in his possession when he went with Ochoa.

The attorney who had been appointed by the court to
represent the defendant said to the jury in his opening
statement regarding what the defendant would testify
to upon the stand: "That Ochoa dogged his footsteps.
He will show that he went down the railroad with Ochoa;
that they fled across the desert until they came to
another railroad; that during this time they traveled the
greater part of the first night and the greater part of
the next day; that upon the second evening he was tired
and thirsty; that he sat down and drank part of a can of
tomatoes which Ochoa had brought along with him; that
he thereupon lay down by the railroad and slept; that in
the morning he arose and Ochoa was gone; that when he
lay down at night his coat was alongside of him, and in
the morning his coat was gone, and Ochoa's was there.
He says he got up and started on his journey, and he will
tell you that this watch, which plays such an important
part in this case, was in the coat. He will tell you that
he came into Amargosa; that he was ignorant and
thirsty and hungry and went into the store to purchase
something to eat, and while in the store he was arrested.
He will tell you that he was searched; that they found
certain things on his person; that they took the purse
and the knife and the gun; that they didn't find the
watch which has been introduced in the case. He will
tell you that this watch was on his person; that he didn't
know what he was arrested for; but that when he was
arrested he suspected there was something in connection
with the watch which had caused the flight of Ochoa

from the town of Leeland. Consider his position: A stranger, entirely ignorant of the laws and customs of this country, found in the midst of hostile people with a piece of evidence on his person which he must know came out of some trouble on the part of Ochoa. He will tell you that the next morning he threw that watch away. He tried to get rid of that evidence upon his person that the watchers found."

Upon the witness stand, Tomas Gutierrez contradicted the defendant's testimony that he had left the saloon and gone with Gutierrez to the bunkhouse and then to bed on the night the men were killed.

Also tending to contradict defendant's statement upon the trial that he had gone to the bunkhouse with Gutierrez and had gone to bed and was not present or aware of the killing of Nelson and Stillwell, there was testimony that the defendant said, a few days after his arrest and before the preliminary hearing, that he and Tomas Gutierrez were present at the time Nelson was stabbed; that Gutierrez knew all about it if he would tell; that Ochoa treated and paid for the drinks, and, looking over his change, made complaint to Nelson that it was wrong, and demanded more money; that Tomas asked Nelson to give him his right change; that Nelson made an effort to use a gun; that Ochoa stabbed or tried to stab Nelson; that, while Ochoa was trying to stab Nelson over the bar, defendant made a pass to stop him; that Stillwell was behind the bar, and defendant could not hold Ochoa.

*J. A. Sanders*, for Appellant.

*R. C. Stoddard*, Attorney-General, and *L. B. Fowler*, Deputy Attorney-General, for the State.

By the Court, TALBOT, J. (after stating the facts as above):

As error it is urged by counsel for defendant that the case was presented to the jury upon two theories: First, that the appellant was guilty as charged in the indict-

ment with killing the deceased with malice aforethought; second, that the homicide was committed in the perpetration of robbery; and that, as the court submitted the case upon both theories, it is impossible for any one to say for what crime the appellant was convicted.

It will be observed that the indictment follows closely the form provided by the statute. Section 17 of the act relating to crimes and punishments provides that: "All murder which shall be perpetrated by means of poison, or lying in wait, torture, or by any other kind of wilful, deliberate, and premeditated killing, or which shall be committed in the perpetration, or attempt to perpetrate any arson, rape, robbery, or burglary, shall be deemed murder of the first degree." (Comp. Laws, 4672.)

Under this statute and the indictment as drawn, defendant could be convicted of either wilful, deliberate, and premeditated killing, or of a killing committed in the perpetration of a robbery, whether it was or was not wilful, deliberate, and premeditated. If the defendant in advance planned or intended to kill in order to accomplish the robbery, and in pursuance of that intent did kill the deceased, he was guilty of both a wilful, deliberate, and premeditated killing, and of a killing in the perpetration of a robbery. These are not separate statutory homicides, and if the jury believed, beyond a reasonable doubt, that the defendant was guilty of killing in either one or both of these ways, they were justified in the rendition of the verdict carrying the extreme penalty. If the indictment had unnecessarily charged that the killing was committed in the perpetration of a robbery, and there had been no evidence indicating that it was committed in such perpetration, proof that the killing was wilful, deliberate, and premeditated would have been at variance with the allegation in the indictment, and an instruction in such a case, based upon the two theories of wilful, deliberate, and premeditated killing and of a killing in the perpetration of robbery, and directing the jury that they could convict upon either, would have been erroneous.

The evidence in this case is stronger than that on which Dr. Crippen was recently convicted and promptly hanged in London, and it is sufficient to justify the conclusion that the killing was done wilfully, deliberately, and premeditatedly for the purpose of accomplishing robbery. But if the evidence indicated that there was a robbery, and there was no evidence indicating a previous intention to kill, nevertheless the killing committed in the perpetration of the robbery would be presumed to have been wilful, deliberate, and premeditated.

In *State* v. *Lindsay*, 19 Nev. 50, 3 Am. St. Rep. 776, Justice Hawley, speaking for this court, said: "Under this statute there are certain kinds of murder which carry with them conclusive evidence of premeditation, viz, when the killing is premeditated by means of poison, lying in wait, or torture; or when the homicide is committed in the perpetration, or attempt to perpetrate, any of the felonies enumerated in this statute. In these cases the question whether the killing was wilful, deliberate, and premeditated is answered by the statute in the affirmative, and, if the prisoner is guilty of the offense charged, it is murder in the first degree. (*State* v. *Hymer*, 15 Nev. 50, and authorities cited.)"

It has often been held that a felony and a homicide committed in perpetrating or attempting to perpetrate it, together, constitute the one crime of murder and may be charged as such and in the same manner as ordinary murders are alleged, and that it is not necessary to charge in the indictment that the murder was committed in the perpetration of another crime in order to introduce testimony showing that a felony was committed in addition to it, and that, under an indictment charging murder in the ordinary form and proof that it was committed in the perpetration of a felony, malice, deliberation, and premeditation are implied. (*State* v. *Meyers*, 99 Mo. 107, 13 S. W. 516; *People* v. *Giblin*, 115 N. Y. 196, 21 N. E. 1062, 4 L. R. A. 757; *State* v. *Covington*, 117 N. C. 834, 23 S. E. 337; *People* v. *Sullivan*, 173 N. Y. 122, 65 N. E. 989, 63 L. R. A. 353, 93 Am. St. Rep. 582; *State* v. *Johnson*, 72

Iowa, 393, 34 N. W. 177; *Wall* v. *State*, 18 Tex. 682, 70 Am. Dec. 302; *Titus* v. *State*, 49 N. J. Law, 36, 7 Atl. 621.)

In *State* v. *Foster*, 136 Mo. 653, 38 S. W. 721, it was held that, while the charge that a homicide was committed in an attempt to perpetrate a robbery is unnecessary, it will not vitiate an indictment for murder in the first degree, and that in such a case the indictment may be drawn in the common form.

In *Reyes* v. *State*, 10 Tex. App. 1, it was held that evidence tending to show that the killing was done in the perpetration of arson, rape, robbery, or burglary is admissible as part of the *res gestæ* on the trial under an indictment charging murder with express malice aforethought.

In *People* v. *Flanagan*, 174 N. Y. 357, 66 N. E. 988, on an indictment for murder in the first degree, a conviction for murder perpetrated while committing a felony, although not specially pleaded, was sustained, and it was said that deliberation and premeditation need not be found.

In *State* v. *McGinnis*, 158 Mo. 106, 59 S. W. 83, it was held that it is proper in a trial under an indictment which only charges murder to instruct the jury that, if the homicide was perpetrated in an attempt to commit robbery, the defendant was guilty of murder in the first degree.

In *State* v. *Weems*, 96 Iowa, 428, 65 N. W. 587, the indictment was in the usual form and without averments as to the murder having been committed in an attempt to perpetrate robbery, and it was held proper to instruct the jury that, if two or more persons conspire to commit robbery, and in pursuance of such conspiracy they or either of them kill a human being, it is murder.

In *State* v. *King*, 24 Utah, 483, 68 Pac. 418, 91 Am. St. Rep. 808, the information for murder contained the usual charge regarding malice and premeditation, but did not mention robbery. It was held sufficient to charge murder in the first degree; and that evidence to show that it was committed in the perpetration of a robbery was properly admissible; and that when two or more persons

associate together to rob another, and he is killed by one of them, the act is that of each and all of the conspirators, and all are chargeable therewith. (*State* v. *Schmidt,* 136 Mo. 652, 38 S. W. 719.)

It is claimed that some of the instructions given by the court were erroneous, and more particularly the following: "The jury are instructed that in this case evidence of flight has been introduced. You are instructed that the flight of a person immediately after the commission of the crime, or after a crime has been committed with which he is charged, is a circumstance in establishing his guilt, not sufficient in itself to establish guilt, but a circumstance which the jury may consider in determining his guilt or innocence. The weight to which that circumstance is entitled is a matter for the jury to determine in connection with all the evidence introduced in the case."

It is said that by the first sentence of this instruction the court charged the jury as to a matter of fact. If it be conceded that this is true, and that the language used would have constituted reversible error if there had been a conflict in the evidence as to whether the defendant fled from the place of the crime, it is not improper for the court to assume and state to the jury that there was evidence of flight, or that defendant had fled when by his own testimony and by the opening statement of his counsel it was admitted that he had fled. It is not error for the court to assume as true facts which are directly admitted by both parties in the case. Under a similar principle of law, the admission of a paper relating to the number of the watch, to which no objection or specification of error appears, was harmless, whether properly proven under the oath of any one knowing it was the correct number, because the effect of the defendant's testimony and the defense interposed amounted to an admission that he was in the possession of the watch of the deceased, and defendant sought to excuse his possession of the watch by his statement on the stand that Ochoa

had taken his coat and had left Ochoa's, in the pocket of which he found the watch.

· Strong objection is also taken to the following instruction: "The jury are instructed that an accessory is he or she who stands by and aids, abets, or assists, or who, not being present, aiding, abetting, or assisting, hath advised and encouraged the perpetration of the crime. He or she who thus aids, abets, or assists, advises, or encourages, shall be deemed and considered as principal, and punished accordingly. You are further instructed that no distinction shall exist between an accessory before the fact, and the principal, or between principals in the first and second degree, in cases of felony, and all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, shall be indicted, tried, and punished as principals."

In the specification of error relating to this instruction it is said: "No objection is made to the form of the indictment, but under the proof in this case there is some evidence tending to prove that the defendant, if guilty at all, committed the crime while in the perpetration of the robbery of the deceased. This is a separate and distinct offense from the crime of murder in the first degree. The instruction, therefore, is inconsistent and confusing and is prejudicial to the defendant, in that it so conglomerates the two issues raised—that of murder in the first degree and that of murder in the perpetration of robbery—it is impossible to determine from the instruction its meaning. If the court intended to present this case to the jury on the two theories suggested therein, in order for the verdict to stand and the instruction to be applicable to the facts, it was necessary for the jury to believe from the evidence, beyond a reasonable doubt, that both theories contained in this instruction were proven."

The first paragraph of this instruction is a copy of section 10 of the criminal practice act (Comp. Laws,

3995), the other paragraph is a correct construction, as held by former decisions of this court, and what we have already said regarding the theory of two offenses is applicable. (*State* v. *O'Keefe,* 23 Nev. 127, 62 Am. St. Rep. 768; *State* v. *Chapman,* 6 Nev. 320; *State* v. *Jones,* 7 Nev. 408; *State* v. *Hamilton,* 13 Nev. 386.)

In the record on appeal it is specified that the court erred because it failed to instruct the jury upon other matters; but it does not appear that any further instructions were drawn or requested, or that any exception was taken in regard thereto. As no objection or exception was taken in the district court to the testimony of one of the witnesses, now claimed to have been erroneously admitted, that Ochoa was well liked and that defendant was quiet and not well liked, although the witness never knew of his having any quarrels, we do not determine whether it was proper evidence. If an objection had been made to its admission, the objection might have been sustained. This court has often held that in both civil and criminal cases the particular ground of an objection or exception to the admission of evidence must be stated. (Crim. Prac. Act, sec. 421, and cases there cited; *State* v. *Jones,* 7 Nev. 408; *State* v. *Murphy,* 9 Nev. 394; *Lightle* v. *Berning,* 15 Nev. 389; *Sharon* v. *Minnock,* 6 Nev. 377; *Schwartz* v. *Stock,* 26 Nev. 150; *State* v. *Williams,* 31 Nev. 377; *Finnegan* v. *Ulmer,* 31 Nev. 525; *McGurn* v. *McInnis,* 24 Nev. 370; Wigm. Ev. 20.)

The judgment is affirmed, and the district court is directed to fix a time and make an order for carrying its sentence into effect according to law.

SWEENEY, J.: I concur.

NORCROSS, C. J., concurring:

I concur in the judgment and in the law of this case as stated in the opinion of Justice TALBOT. There are, however, some matters disclosed by the record which, in my judgment, are worthy of further consideration although not affecting the ultimate result of this appeal.

The counsel appointed to present this case upon appeal,

while urging a number of points of alleged error, frankly admitted his doubt as to whether they could be considered upon the record because of the lack of proper objections and exceptions. It was argued that the attorney who defended the appellant at the trial was inexperienced and failed to object to certain evidence, the admission of which was strongly urged to be prejudicial to the defendant, and that in other particulars there was a failure to incorporate in the record proper objections and exceptions. It was urged that this court should, in view of the fact that this was a capital case, consider the points urged upon the argument upon appeal whether or not exception had been taken in the lower court. Had there been an objection interposed to certain of the evidence claimed to be most prejudicial to the defendant, doubtless the trial court would have ruled properly upon it, and, if it was in fact inadmissible, would have excluded it.

If the defendant had been the only one implicated in the killing of Nelson, it would be much easier to reach a satisfactory conclusion as to the measure of the defendant's guilt. This case was prosecuted upon the theory that the homicide was committed in carrying out the crime of robbery. The state offered evidence tending to establish the fact that Nelson had in his saloon or upon his person on the night of the killing a sum of money ranging from $150 to $200. Whatever money Nelson had was taken, with the exception of a five-dollar bill and a few cents. When the defendant was arrested, there was no money found upon him other than the amount which could be accounted for as having been left from his monthly payment after deducting the bills which he is shown to have paid.

The state offered in evidence in rebuttal statements made by the defendant to a countryman of his shortly after the arrest.

In this statement the defendant said that Ochoa had treated; that the trouble which resulted in the death of Nelson grew out of a dispute over the change that was paid to Nelson by Ochoa; that Nelson started to use his

gun, which was behind the bar; that Ochoa then stabbed him; that Stillwell started to get out of the saloon; that Ochoa started after him; that the defendant endeavored to stop Ochoa, but did not succeed in doing so. When the homicide was discovered, the following day, there was found upon the bar a glass of beer nearly full and a bottle of beer partly full, and a bottle containing a small quantity of Hostetter's Bitters. On the floor near the door and bar was a heavy bar bottle containing some whisky and a glass lying near it. There was blood upon the top of the bar and also the imprint of bloody fingers of both hands "outlined very perfectly." There was also some blood upon the standing board behind the bar and some broken bottles at that point. So much of the statement which the defendant made shortly after his arrest, as to the point at which the stabbing of Nelson occurred, appears to be borne out by physical facts.

A witness, who had charge of the property after the homicide, and who testified concerning the boards which covered the top of the bar, which were offered in evidence, testified that, for sanitary reasons, he had thoroughly scrubbed and cleaned the blood from off the top of the bar. The witness in his efforts at sanitary precautions destroyed what might have been one of the most valuable pieces of evidence in this case. Had the bloody finger-prints been preserved, it could doubtless have been established with certainty whether or not they were those of the defendant, and thus clearly have established whether or not the defendant or Ochoa was the actual assassin of Nelson. In the statement which the defendant made shortly following his arrest he accounted for his possession of the watch of Nelson by stating that Ochoa had given him his (Ochoa's) coat, and the watch with it. If the coat which the defendant had on at the time of his arrest, and which he said was Ochoa's, did not in fact belong to the latter, that fact could easily have been disproved, and we may safely take it for granted that that portion of his statement was true. The watch was of little value and was the only thing

found on the person of the defendant identified as belonging to Nelson.    If Ochoa was the more guilty of the two, he may have had a motive in giving the watch to the defendant.

The witness Felip Gutierriz, who was also employed as a section hand upon the railroad, testified upon the part of the state that during the night of the killing he heard voices and heard one person say: "Let's get away from here.    We have been in a fight in the saloon."

If it were true, as stated by the defendant after his arrest, that the killing of Nelson was the result of a difficulty over the amount of change paid to Ochoa, then the larceny may have been an afterthought and carried out to aid Ochoa and the defendant in getting out of the country.    This, of course, is speculative, and not to be considered as affecting the judgment.    The jury was the exclusive judge of the weight to be given to the testimony, and it was its proper function to determine from all the circumstances established the guilt or innocence of the defendant.    Had Ochoa been captured, much that is now doubtful as to the extent in which the defendant participated in the crime would possibly have been cleared up.

The testimony of the defendant given upon the trial doubtless did him more harm than good.    It was unreasonable in some respects, and in conflict with his statements regarding the affair following his arrest.    His statements made following his arrest, which were offered by the state, in which he admitted his presence at the killing, were more reasonable and more favorable to himself than his testimony given at the trial, which conflicted in material points therewith.

While recognizing it was within the province of the jury, not only to determine the credibility of the witnesses and the weight to be given to the evidence offered, but also, upon finding the defendant guilty of murder in the first degree, to impose the death penalty instead of life imprisonment, nevertheless, after a very careful examination of the record, I cannot refrain from

expressing the doubt that exists in my mind as to whether the ends of justice will be subserved by carrying out the judgment of the court to the full letter.

In view of the youth of the defendant, his ignorance of the English language, the inexperience of his counsel, taken in connection with the fact that all the evidence was circumstantial, and that there was another participant in the crime, who escaped and who may have been the more guilty, I am impressed that the ends of justice would be subserved if the sentence of the defendant was commuted to life imprisonment. If the board of pardons should see fit to commute the sentence in this case, a result would be reached in consonance with what I believe would be a more just determination of the case. If precedent were needed for the position I have taken, the same may be found in the recent case of *State* v. *Byrd* (Mont.), 111 Pac. 407, 416.