*886
 
 OPINION
 

 Per Curiam:
 

 Todd Evans was convicted at trial of murder, false imprisonment, battery with a deadly weapon and kidnapping. We affirm these convictions.
 

 FACTS
 

 In the early morning of April 4, 1995, Tracy Wilkinson was brutally beaten over a period of several hours at the residence of Todd Evans on Plumb Lane in Reno, Nevada. Wilkinson was then thrown into a mine shaft on Peavine Mountain and shot several times.
 

 The convictions in this case were primarily based on the testimony of Larry Hall and Glenn Rasco. During the trial, Evans implicated Hall and Rasco as the perpetrators. All three agreed that, on the day of the murder, Hall, Rasco, Evans and Wilkinson arrived at Evans’ house at about 3:30 a.m. The events following their arrival at the home were in contention.
 
 [1]
 

 Rasco’s and Hall’s Testimony
 

 Rasco and Hall gave the following account of the events in question.
 

 According to Rasco, he had neither met nor seen Hall before the night of April 3, 1995. Both Hall and Rasco indicated that,
 
 *887
 
 after arriving at Evans’ house, Evans was extremely upset with Wilkinson. Evans was so angry that he pointed a gun at Wilkinson and threatened to kill him. Thereafter, Evans repeatedly struck Wilkinson with his fists, his feet, and with blunt objects over the next two hours. Wilkinson lapsed in and out of consciousness during this continuing series of assaults.
 

 At one point during the beatings, Rasco threw Wilkinson off of Evans’ couch and told him to quit bleeding on the furniture. Rasco also threatened to kill Wilkinson (he admits kicking Wilkinson in the head). Rasco claimed that he complied with Evans’ demands, and even pretended to participate in the beating, because he was terrified that Evans would kill him as well. Hall also testified that he was afraid for his life.
 

 On Evans’ instructions, after it appeared that Wilkinson would not regain consciousness, Rasco tied Wilkinson’s hands with a length of leather shoestring and Hall retrieved some electrical cord and a pillow case. Rasco then tied the pillow case over Wilkinson’s head with the cord and rolled him up in a tarp that either Evans or Hall had retrieved from the garage.
 

 Evans then directed Hall and Rasco to place Wilkinson in the back of his white Jeep Cherokee that had been backed up to the front door. Hall testified that he and Rasco carried Wilkinson out to the truck. (Rasco denies this.) Evans then “ushered” Hall and Rasco into the Jeep.
 

 It was about 6:00 a.m when they loaded the Jeep and approximately 6:15 a.m. when they departed from the Evans residence. Evans said that they had to leave before 6:30 a.m. because he was expecting his father.
 

 Evans told Rasco and Hall that they were going to the “mine shaft.” Not long into the trip, the three pulled into a 7-11 store on McCarran Boulevard for gas. Hall pumped the gas and Evans went inside to pay. When Rasco saw that Hall did not have the gun, he ran away. Hall testified that, although he too wanted to escape, he could not do so because of his physical condition and because he was afraid of being caught.
 

 Rasco ran to a nearby house, knocked on the door, told the inhabitant that he had just witnessed a murder and to call 911, and then hid between the houses until the police arrived. The man in the house testified that Rasco’s clothes were covered with blood, and that Rasco was “frantic,” looked “scared to death,” and kept repeating that “they’re chasing me.”
 

 The police officer that responded to the call testified that Rasco wanted her to talk with him between the houses and was reluctant to come into the front yard. Rasco told her that “they have guns, they are going to kill me.” He also stated that “they” had killed
 
 *888
 
 Wilkinson and that “they” were at the 7-11. Rasco identified “they” as Todd Evans and “Frank.”
 
 [2]
 

 When Evans returned to the Jeep after paying for the gas, he asked Hall where Rasco had gone. Upon being told of Rasco’s flight, Evans argued in favor of finding Rasco to avoid being discovered. However, when they got back into the Jeep, they drove directly to the mine shaft on Peavine Mountain. Hall testified that the drive took about ten minutes.
 

 Upon their arrival at the mine, Evans backed the Jeep up to the mine entrance, opened the back hatch to the Jeep and pushed Wilkinson down into the hole. Upon Evans’ orders, Hall took a shovel into the shaft and pushed some loose dirt and snow over the body. Evans then instructed Hall to shoot Wilkinson. Hall responded: “He’s dead. He’s been dead for over an hour. Leave him alone.” However, after being threatened by Evans, Hall shot Wilkinson’s buried body and threw the gun back to Evans. Evans also fired four shots into the hole, after which the two left the scene.
 

 When they returned to McCarran Boulevard, they encountered a police cruiser and a chase ensued. Evans sped away and eventually turned down a dead-end street, where he and Hall abandoned the Jeep. They then obtained a ride to Evans’ home. Later that morning, Evans and Hall set out for Sacramento, California. At his first opportunity, Hall escaped in their vehicle and drove back to Reno. The next day, Hall directed the police to the mine shaft.
 

 Evans’ Testimony
 

 Evans claims that, upon arriving at his house prior to the time of the homicide, he and Hall went into the garage and discussed where they could purchase methamphetamine. When Evans heard a scuffle in the house, he proceeded to the living room area, where he found Rasco and Wilkinson fighting. In the process of stopping the fight, Evans hit Rasco and injured his hand. Evans then instructed Hall to watch over Rasco and Wilkinson while he was out purchasing methamphetamine.
 

 Evans returned to the house sometime after 5:00 a.m., at which time he found the couch tipped over and Hall mopping up a pool of blood. At the same time, he noticed that Rasco was “stressed out” and “really agitated.” When pvans asked where Wilkinson was, Hall told him that “it was personal” between Rasco and Wilkinson, that Wilkinson was in the Jeep, and that they were going to take Wilkinson to the home of Wilkinson’s
 
 *889
 
 girlfriend. Evans claims that he remained behind at the house to clean up after the other two left with Wilkinson.
 

 A short time later, in response to a call from Hall, Evans left his home to meet Hall and Rasco at a Bank of America parking lot across from the 7-11 store on McCarran Boulevard. When Evans arrived, Hall was in the driver’s seat of the Jeep and Rasco was talking to Hall through the driver’s side window. Neither Hall nor Rasco would tell Evans where Wilkinson was at that time. Evans also noticed that the Jeep had mud on its side, but had been clean when they left the house.
 

 After driving the Jeep from the lot to the 7-11 store, Evans went inside to pay for the gasoline and to purchase a drink.
 
 [3]
 
 When he returned to the Jeep, Rasco was gone. Evans then noticed a .45 caliber pistol in the car.
 

 Thereafter, while looking for Rasco on McCarran Boulevard, a police car attempted to effect a stop of their vehicle. Because Evans is an ex-felon and knew he would be arrested if found armed, he tossed the weapon out of the window and sped away. Eventually, after abandoning the Jeep, he and Hall were able to acquire a ride home utilizing a ruse that their car had broken down.
 

 Evans claims that he and Hall then drove to Sacramento on business. While there, Evans called his father and discovered that he was a suspect in Wilkinson’s murder. While on the phone, Hall left and Evans never saw him again.
 

 Other Witnesses
 

 Evans’ neighbor, a school teacher named Robert Deruse, drove by Evans’ house at about 6:15 a.m. on April 4th, on his way to school. He saw a Jeep parked on the grass and backed up to the front door. The back hatch of the Jeep was open and the headlights were on. The front door of the house was also open.
 

 Kenneth Caywood was on McCarran Boulevard, at about 6:30 a.m. on April 4th, when he saw a white Jeep Cherokee pull away from the 7-11 store on McCarran. The Jeep accelerated quickly and was being driven in an erratic manner. He saw two men in the Jeep, one of whom had blond hair.
 
 [4]
 
 He was also sure that the Jeep was “extremely clean,” “immaculate,” and had a car dealer’s plate on the back.
 
 [5]
 

 
 *890
 
 The Reno police officer, Michael Lessman, who pursued Evans and Hall on McCarran Boulevard and eventually found the abandoned Jeep also testified at trial. He stated that he received a report at 6:39 a.m. that a white Jeep with a dead body in it was stopped at a nearby 7-11 store. At 6:59 a.m., he saw a white Jeep Cherokee with no front license plates heading southbound on McCarran at a high rate of speed. Lessman chased the Jeep and located it, abandoned, at 7:04 a.m. At trial, Lessman identified Evans as the driver of the Jeep.
 

 Margaret Carson testified that several days after Wilkinson’s death, Hall told her that he and Rasco had taken Wilkinson’s body to the mine and that Evans later met them at the 7-11 store on McCarran Boulevard. Carson stated that Hall said “that Evans wanted him to take him up there, he was scared by that time so he took him up there, him and Glenn took him up there.”
 

 The coroner testified that Wilkinson’s blood was still circulating when the gunshot wound to the head occurred. He also testified that, although not likely, Wilkinson could have survived the blunt trauma to his head, but that the gun shot would certainly have been fatal. The cause of death was listed as blunt force trauma to the head in combination with the gunshot wound.
 

 Evans was charged with one count of first-degree murder based on allegations of premeditated murder, felony-murder (kidnapping), and aiding and abetting Hall in the premeditated murder of Wilkinson. Evans was also charged with false imprisonment, kidnapping with a deadly weapon in the first degree for the purpose of killing, and battery with a deadly weapon.
 

 The jury found Evans guilty on all charges. He was sentenced to three consecutive terms of life in prison without the possibility of parole for first-degree murder, for using a deadly weapon in the commission of the murder, and for kidnapping. He was also sentenced to six years in prison for false imprisonment; he received no additional sentence for battery. This appeal ensued.
 

 Evans presents three arguments: (1) that there was insufficient evidence at trial to corroborate the testimony of the two accomplices, Hall and Rasco, (2) that the district court erred in failing to require a unanimous jury verdict on the theories of first-degree murder, and (3) that there was insufficient evidence to prove that Evans kidnapped Wilkinson with the intent to kill or inflict substantial bodily harm.
 

 DISCUSSION
 

 Corroboration of Accomplice Testimony
 

 NRS 175.291(1) provides that
 

 [a] conviction shall not be had on the testimony of an accomplice unless he is corroborated by other evidence
 
 *891
 
 which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration shall not be sufficient if it merely shows the commission of the offense or the circumstances thereof.
 

 Evans argues that both Hall and Rasco were accomplices and that there is insufficient evidence in the record to corroborate their testimony. Without their testimony, he claims that there is insufficient evidence to support his conviction of murder, kidnapping and false imprisonment. Although conceding that Hall was an accomplice because he admitted to aiding in Wilkinson’s murder, the State argues that Rasco was not an accomplice.
 

 Interpreting NRS 175.291(2),
 
 [6]
 
 this court has held that an accomplice is “one who is liable to prosecution for the identical offense charged against the defendant ... or who is culpably implicated in, or unlawfully cooperates, aids or abets in the commission of the crime charged.” Orfield v. State, 105 Nev. 107, 109, 771 P.2d 148, 149 (1989). In addition, “some sort of bad state of mind is required as well.”
 
 Id.
 
 (quoting W. LaFave, A. Scott,
 
 Criminal Law,
 
 176 (1972)).
 

 Rasco testified that he kicked Wilkinson and tied his hands together. Hall testified that Rasco threw Wilkinson off of Evans’ couch and said: “Quit bleeding on Todd’s furniture.” Hall also testified that Rasco told Wilkinson: “Shut up or we’ll kill you.” Further, Hall testified that Rasco helped carry Wilkinson to the Jeep. Rasco testified that he did not intend to hurt Wilkinson, but cooperated with Evans under the threat of being killed.
 

 Because the jury returned a general verdict, it is unclear whether it concluded that Rasco was an accomplice. If the jury found that Rasco was not an accomplice, it could have believed his testimony and convicted Evans on that testimony alone. However, based on the foregoing evidence, it could have believed that Rasco aided in kidnapping Wilkinson by tying his hands together and helping Hall carry him to the Jeep with the intent required for accomplice liability. If the jury found that Rasco was an accomplice, the issue becomes whether there is sufficient evidence in the record to corroborate Hall’s and Rasco’s testimony.
 

 “Corroborative evidence ‘need not in itself be sufficient to establish guilt’ — ‘it will satisfy the statute if it merely tends to connect the accused to the offense.’ ” Heglemeier v. State, 111
 
 *892
 
 Nev. 1244, 1250, 903 P.2d 799, 803 (1995) (citing Cheatham v. State, 104 Nev. 500, 504-05, 761 P.2d 419, 422 (1988)).
 

 Corroborating evidence, however, must independently connect the defendant with the offense; evidence does not suffice as corroborative if it merely supports the accomplice’s testimony. If there is no indépendent, inculpatory evidence-evidence tending to connect the defendant with the offense, “there is no corroboration, though the accomplice may be corroborated in regard to any number of facts sworn to him.”
 

 Id.
 
 (quoting Austin v. State, 87 Nev. 578, 585, 491 P.2d 724, 728-29 (1971)). In addition,
 

 “where the connecting evidence ‘shows no more than an opportunity to commit a crime, simply proves suspicion, or is equally consonant with the reasonable explanation pointing toward innocent conduct on the part of the defendant, the evidence is to be deemed insufficient.’ ”
 

 Id.
 
 at 1250-51 (quoting State v. Dannels, 734 P.2d 188, 194 (Mont. 1987) (quoting State v. Mitchell, 625 P.2d 1155, 1158 (Mont. 1980)).
 

 In the present case, the two strongest pieces of corroborative evidence that contradict Evans’ version of these events are (1) testimony of the eye witness who saw the Jeep on Evans’ lawn at about 6:15 a.m., and (2) the 7-11 receipt stamped at 6:30 a.m.
 

 Evans recounts that Hall and Rasco left the house without him, went to the mine shaft without him, got out of the Jeep, carried Wilkinson to the mine shaft, dumped the body, shot Wilkinson, returned to the Jeep, drove to the Bank of America near the 7-11 on McCarran, noticed they were low on gas and money, and called Evans from an unidentified telephone. According to Evans, he did not leave the house until he received that telephone call. He claims that he then got into another car, drove to the Bank of America, got out of his car, went over to the Jeep, had a conversation with Hall and Rasco, got into the Jeep, drove to the 7-11 store, pumped gas, and paid for it. However, according to the corroborating evidence, all of the above events must have occurred within 10 to 20 minutes, i.e., the time the witness saw the Jeep on the front lawn (between 6:10 and 6:20 a.m.) until Evans bought the gas at 7-11 at 6:30 a.m.
 

 Additional testimony indicated that, if all of the lights were green, it would take about six or seven minutes to reach the 7-11 from Evans’ house. From there, it would take another ten minutes
 
 *893
 
 to reach the mine, which is about one mile off of a paved road on Peavine Mountain. Assuming a similar time frame to return from the mine, in addition to the time it took to shoot and dispose of the body, the version of events Evans described simply could not have taken place in 10 to 20 minutes.
 

 Further, Deruse’s testimony, when considered in conjunction with the 7-11 receipt, corroborates the versions of Hall and Rasco. Hall testified that they all left the Plumb Lane house at about 6:15 a.m. and that it took about ten minutes to get from the 7-11 store to the mine. Thus, if Deruse saw the Jeep at about 6:15 a.m., just before they left, they would have arrived at the 7-11 at about 6:22 a.m. Thus, by the time the gas and Gatorade purchase was completed, it would have been about 6:30 a.m. This, of course, is consistent with the 7-11 receipt.
 

 Further, Caywood’s testimony corroborates the Hall-Rasco version of these events, to wit: that he saw an “extremely clean,” “immaculate” white Jeep Cherokee coming from the direction of the 7-11 heading north, toward the mine shaft, on McCarran Boulevard at about 6:30 a.m. on April 4, 1995; that the Jeep was being driven in an erratic manner; that there were two men in the Jeep; and that, although he did not see their faces, he was sure one of the men had blond hair. (Evans is the only person among the group of persons present that night that has blond hair.) By contrast, Evans testified that by 6:30 a.m., when he found Hall and Rasco at the 7-11, the sides of the Jeep were covered with mud.
 

 In addition, the person who called 911 for Rasco testified that Rasco was “frantic,” looked “scared to death,” and kept repeating that “they’re chasing me.” The officer who responded to the call claims that Rasco told her that “they have guns, they are going to kill me.” He told her that “they” had killed Wilkinson and that “they” were at the 7-11.
 

 Based on the foregoing, we conclude that there was independent,- implicating evidence that corroborated the version of events recounted by Rasco and Hall, which was not equally consonant with Evans’ version of these events. Therefore, even if the jury found that Rasco and Hall were accomplices, there was sufficient corroborating evidence to sustain the convictions herein.
 

 Jury Unanimity
 

 The information alleged three different theories under which Evans could be found guilty of first-degree murder: (1) first-degree murder based upon allegations that he personally killed Wilkinson “with malice aforethought, deliberation, and premeditation”; (2) first-degree murder based upon allegations that
 
 *894
 
 Evans or an accomplice killed Wilkinson “in the perpetration of a kidnapping from 1475 West Plumb Lane, Reno, to the southwest face of Peavine Mountain” in violation of NRS 200.030; and (3) that Evans “did aid or abet Larry Hall who did willfully and unlawfully, and with malice aforethought, deliberation, and premeditation, kill and murder Tracy Wilkinson.”
 

 The district court instructed the jury as follows:
 

 All verdicts returned in this case must be unanimous. In considering Count I, Murder, the State has alleged three theories of First Degree Murder. The three theories of Murder in the First Degree alleged by the State in Count I are:
 

 (1) Premeditated and deliberate murder; or
 

 (2) That the murder was perpetrated in the furtherance of a kidnapping; or
 

 (3) That the defendant did aid and/or abet another in murder.
 

 However, you need not be unanimous in finding that the murder was premeditated and deliberate, or that it was perpetrated in the furtherance of a kidnapping or that the defendant did aid or abet another in the murder.
 

 Thus, you do not have to agree on the theory of Murder in the First Degree, it is sufficient that each of you find beyond a reasonable doubt that the murder, under any one of the three theories, was murder of the first degree.
 

 The jury returned a general verdict that stated: “We the jury in the above-entitled matter find the defendant, Todd Evans, Guilty of Count I: Murder.”
 

 Evans contends that the district court violated his right to due process in not requiring jury unanimity on each of the three theories of criminality because each requires a different mens rea.
 

 NRS 200.030(1) provides that murder in the first degree is murder which is:
 

 (a) Perpetrated by means of poison, lying in wait, torture or child abuse, or by any other kind of willful, deliberate and premeditated killing;
 

 (b) Committed in the perpetration or attempted perpetration of . . . kidnapping ....
 

 The Supreme Court of the United States has addressed this issue as it relates to premeditated murder and “felony murder” perpetrated during the commission of a robbery. In Schad v. Arizona, 501 U.S. 624, 632 (1995), the Supreme Court concluded that the trial court did not err in failing to require a jury to agree on a single theory of first-degree murder. Quoting from
 
 Schad:
 

 
 *895
 
 That is not to say, however, that the Due Process Clause places no limits on a State’s capacity to define different courses of conduct, or states of mind, as merely alternative means of committing a single offense, thereby permitting a defendant’s conviction without jury agreement as to which course or state actually occurred. . . . Thus it is an assumption of our system of criminal justice “so rooted in the traditions and conscience of our people as to be ranked as fundamental,” . . . that no person may be punished criminally save upon proof of some specific illegal conduct.
 

 Id.
 
 at 632-33 (quoting Speiser v. Massachusetts, 357 U.S. 513, 523 (1958)).
 

 The Court went on to state that, when the differences in mens rea or intent become so important that those differences may not reasonably be viewed as alternatives to a common end, the Constitution requires them to be treated as separate offenses subject to separate jury findings.
 
 Id.
 
 at 633.
 

 If, then, two mental states are supposed to be equivalent means to satisfy the mens rea element of a single offense, they must reasonably reflect notions of equivalent blameworthiness or culpability, whereas a difference in their perceived degrees of culpability would be a reason to conclude that they identified different offenses altogether.
 

 Id.
 
 at 643.
 

 Schad
 
 further reasons that “it is not whether premeditated murder is necessarily the moral equivalent of felony murder in all possible instances.”
 
 Id.
 

 Whether or not everyone would agree that the mental state that precipitates death in the course of robbery is the moral equivalent of premeditation, it is clear that such equivalence could reasonably be found, which is enough to rule out the argument that this moral disparity bars treating them as alternative means to satisfy the mental element of a single offense.
 

 Id.,
 
 at 644-45;
 
 see also
 
 State v. Mangana, 33 Nev. 511, 517, 112 P. 693, 696 (1910) (felony murder carries with it a conclusive presumption of malice); 3 J. Stephen,
 
 History of the Criminal Law of England
 
 21-22 (1883) (the intent to kill and the intent to commit a felony are alternative aspects of the single concept of malice aforethought).
 

 In this case, Evans was charged with first-degree kidnapping with the intent to kill or inflict substantial bodily injury. We hold
 
 *896
 
 that the Constitution does not require separate instructions or ju y unanimity on the alternative theories of premeditated and feloi ■ murder in this case because actual intent to kill during t commission of a kidnapping can reasonably be considered tl . “moral equivalent of premeditation.”
 

 Next, we must determine an issue not addressed by
 
 Schad,
 
 • • wit, whether the jury should have been separately instructed
 
 .n
 
 aiding and abetting murder. The State argues that the “legislature has left no room for speculation. One who aids and abets is a principal and subject to the same penalties as the shooter. NRS 195.020.” NRS 195.020 provides that a principal is any:
 

 person concerned in the commission of a felony, . . . whether he directly commits the act constituting the offense, or aids or abets in its commission, and whether present or absent; and every person who, directly or indirectly, counsels, encourages, hires, commands, induces or otherwise procures another to commit a felony . . . shall be proceeded against and punished as such.
 

 We undertake this “inquiry . . . with a threshold presumption of legislative competence to determine the appropriate relationship between means and the ends in defining the elements of a crime.”
 
 Schad,
 
 501 U.S. at 637-38. Under NRS 195.020, the legislature has made its own determination of moral equivalence between “aiding and abetting” and actual physical perpetration of an offense.
 

 The record in this case contains competent testimony that Evans beat Wilkinson nearly to death, threatened to kill him several times, planned to kill him at the mine shaft, transported him to Peavine Mountain, and then commanded Hall to shoot him. We hold that, even if Wilkinson was not dead before Hall used the weapon, there was sufficient evidence in the record to prove that Evans intended to kill Wilkinson. Therefore, Evans’ mental state in the course of aiding and abetting Hall can reasonably be considered the equivalent of malice aforethought.
 

 Accordingly, we hold that the district court did not err in failing to separately instruct the jury on premeditated murder, felony murder, and aiding and abetting murder; or to require unanimity on any one of the individual theories of culpability.
 

 First-Degree Kidnapping
 

 Evans argues that there was insufficient evidence to support a conviction of kidnapping in the first degree. When a criminal defendant challenges the sufficiency of the evidence, “[t]he rele
 
 *897
 
 vant inquiry for this Court is ‘whether, after viewing the evidence in the light most favorable to the prosecution,
 
 any
 
 rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.’ ” Koza v. State, 100 Nev. 245, 250, 681 P.2d 44, 47 (1984) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original)).
 

 NRS 200.310(1) provides:
 

 A person who willfully seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away a person by any means whatsoever ... for the purpose of killing the person or indicting substantial bodily harm upon him, ... is guilty of kidnapping in the first degree which is a category A felony.
 

 In this case, Rasco testified that Evans told Hall early in the course of events that Hall would shoot Wilkinson at the mine shaft. Thereafter, Evans directed Hall to load Wilkinson in the Jeep, and then Evans drove Wilkinson to the mine shaft. Once at the mine, Hall testified that Evans forced him to shoot Wilkinson even after Wilkinson was buried.
 

 Evans argues that, according to the evidence, Wilkinson had been dead for over an hour at the time of the shooting. Thus, Evans could not have intended to kill Wilkinson when he was placed into the Jeep. This contention is without merit. The fact that Evans directed Hall to shoot Wilkinson and that Evans fired several bullets into the shaft is sufficient evidence to prove that Evans did not believe Wilkinson was dead when he was loaded into the Jeep. Further, the medical evidence in the case suggests that Wilkinson was still alive at the time of the shooting.
 

 We therefore hold that there was sufficient evidence in the record to prove that Evans kidnapped Wilkinson for the purpose of killing him.
 

 Based on the foregoing, we uphold Evans’ conviction.
 

 [1]
 

 Hall and Rasco testified for the prosecution and Evans testified in his own behalf. At trial, Rasco and Hall recounted similar events leading up to Wilkinson’s murder. Evans’ testimony was in direct conflict with their testimony.
 

 [2]
 

 Hall’s first name is Larry.
 

 [3]
 

 A receipt from the 7-11 store was time stamped 6:30 a.m., April 4, 1995. It was admitted into evidence without objection.
 

 [4]
 

 Evans has blond hair, while Rasco, Hall and Wilkinson all have dark hair.
 

 [5]
 

 The Jeep did not have license plates.
 

 [6]
 

 NRS 175.291(2) provides that, “[a]n accomplice is . . . defined as one who is liable to prosecution, for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.”