## THE STATE v. DREHER, *Appellant.*

### Division Two, January 19, 1897.

1. **Practice**: MURDER: NEGLIGENCE OF ATTORNEY. The negligence or incompetency of defendant's attorney on a trial for murder is not a sufficient reason for granting a new trial.

2. ———: ———: ———. The facts in this case examined and *held* not to support the charge of the inefficiency of defendant's counsel.

3. ———: ———: INSANITY. Where, on a trial for murder, there is much evidence to support, and much to disprove, the plea of insanity and the instructions fairly state the law, the supreme court will not disturb the verdict.

*Appeal from St. Louis Criminal Court.*—HON. THOMAS B. HARVEY, Judge.

AFFIRMED.

*Lee Meriwether* for appellant.

(1) The record shows that the management of the case in the trial court by appellant's attorney was so totally lacking in care and skill that he did not have that fair trial which the constitution guaranties and to which of right he is entitled. *White v. Washington*, 1 Barnes, 411; *Godefroy v. Dalton*, 6 Bing. 460; *Reece v. Rigby*, 4 B. & Ald. 202; *Sharp v. Mayor*, 31 Barb. 578. (2) The instruction given by the court that one may be partially insane and yet be responsible for criminal acts is contrary to reason and medical science and improper because calculated to mislead the jury. (3) Upon the record in this case grave doubt as to appellant's sanity must assuredly arise; it would be a blot upon the fair fame of Missouri to execute a lunatic, merely because his counsel failed to assort his testimony and present his case to the state's expert witnesses, and

to the jury. Because of this, and in the name of humanity, we ask the court to give the appellant the benefit of the doubt and remand the case for a new trial.

*R. F. Walker*, attorney general, and *C. O. Bishop* for the state.

(1) The indictment is sufficient in all respects, following the most approved precedents, and there is no error apparent in the record. (2) The verdict is fully sustained by the evidence; the plea of insanity admitted the killing (*State v. Pagels*, 92 Mo. 300), and the evidence abundantly established both the fact of the killing and the fact that there was no provocation whatever to reduce the grade of homicide. *State v. Kotovsky*, 74 Mo. 247. The fullest latitude was given the appellant in supporting his plea by testimony. He does not claim in his motion for new trial that any testimony offered by him was excluded; nor (as will be hereafter seen) was any incompetent testimony admitted against him. The question of his insanity was fairly submitted to the jury for their finding, and although there was testimony from many sources and from a "cloud of witnesses" that appellant for several years before the homicide was eccentric, peculiar, erratic and perhaps diseased in mind, that testimony did not show that he was so diseased in mind that he did not know right from wrong and the consequences of his acts; and the verdict, upon the facts, should not be disturbed. *State v. Schaefer*, 116 Mo. 96. (3) There is nothing in the record, save the bare statement in the motion for new trial, to show that the prosecuting officer was guilty of the slightest misconduct. (4) The instructions given by the court of its own motion were correct in every particular and fully declared all the law of the case. They are a

rescript of those in former cases which have been approved by this court. *State v. Redemeier*, 71 Mo. 173; *State v. Pagels*, 92 Mo. 300; *State v. Schaefer*, 116 Mo. 96.    (5) The instruction refused has already been substantially given by the court of its own motion. "4. * * * The law presumes the defendant to be inno- cent and the burden of proving his guilt rests with the state, and before you should convict him his guilt must be established beyond a reasonable doubt;" and "7. If, upon the whole case, you are not satisfied of the defendant's guilt to a moral certainty and beyond a reasonable doubt, you should acquit him; but if you are thus satisfied your duty is to convict him. By the term reasonable doubt is not meant a mere guess or conjecture of innocence, but a reasonable and substan- tial doubt arising out of the evidence." *State v. Pagels,* 92 Mo. 300.    (6) A careful examination of the volu- minous record in this cause fails to show that the court admitted any illegal or incompetent testimony against the appellant.

GANTT, P. J.—The defendant was indicted at the May term, 1894, of the St. Louis criminal court for the murder of Bertha Hunicke on January 29, 1894.

At the same term it was suggested to the court that he was at that time insane and a jury was impaneled to try his insanity. Their finding was that he had become insane since the killing, and was then insane. There- upon the criminal court ordered him transferred to the city insane asylum, until he should become sane. At the May term, 1895, the superintendent of the asylum notified the court that he had recovered and another jury was impaneled to try his sanity and after a hearing they found him to be sane. The cause was thereupon docketed and set down for trial at the January term, 1896.    At that term defendant was duly arraigned but

stood mute and the plea of "not guilty" was ordered to be entered in his behalf and thereupon, both sides announcing ready, a jury was impaneled, the cause heard and defendant convicted of murder in the first degree. At the March term, 1896, he was sentenced to be hanged, from which he appeals.

The killing was established and conceded. The defense was insanity.

The deceased, Bertha Hunicke, was a young married woman; her home was in Pacific, Missouri, but her husband had met with an accident, whereby he became crippled and was unable to support her, so she came to St. Louis and engaged as a domestic. At the time of her death she was temporarily residing with her married sister, Mrs. Agnes Hanson, at 821 Madison street. Appellant was clerking in a retail grocery store in the neighborhood and became acquainted with deceased through her coming to the store to purchase family supplies. He grew enamored of her, paid her assiduous attention, urged her to obtain a divorce from her husband and to marry him. At first she treated his attentions pleasantly, then with indifference, afterward with disdain and at length protested against them and repelled him; and he was urged to keep away from the house where she was staying. He made her some presents of jewelry, which she returned to him. On Saturday, January 27, 1894, he came to the house in the evening to see her, and tendered her a box of candy which she refused. After some conversation she asked him to go away and let her alone and not bother her; and he said to her, "Never mind, Bertha, perhaps we will stand a chance to die together," to which she answered, "Now you have threatened my life in front of Emma; I have a witness," referring to a lady friend present, Mrs. Littreal.

On Monday afternoon, January 29, 1894, about 4

o'clock, he came to the house again and went into Mrs. Hanson's bedroom, where her three children were. Mrs. Hanson and Mrs. Littreal were in the kitchen preparing supper.    Shortly afterward Mrs. Hunicke came in and finding appellant there seemed to be angry about it.    In a few minutes the two women in the kitchen heard three shots fired, and running to the bedroom saw deceased standing against the wall holding her head in her hands, and appellant lying on the floor with a smoking revolver in his hand and blood flowing from his head.    Deceased exclaimed, "Charley shot me!"    Mrs. Hanson ran out on the street for an officer and Mrs. Littreal took up the baby from the bed and returned to the kitchen; then two more shots were heard; Mrs. Hanson ran back to the room, and found deceased lying across the doorsill just dying; appellant partly rose from the floor, leaning on his arm and pointing the pistol at deceased; Mrs. Hanson snatched the weapon from his hand and tossed it upon the bed. He rose to his feet, and she asked him, "Why did you murder my sister?"    He replied, "I shot her," and staggered from the room.    Mrs. Littreal, after hearing the last two shots, started back to the room and met appellant coming toward her with a hatchet in his hand with which he was striking himself on the head. Affrighted, she turned and ran back with the baby into the closet in the rear and fastened the door; she heard him come down the steps behind her, climb over the closet and a fence back of it.    After he was gone, she returned to the bedroom and found Mrs. Hunicke dead.

A few minutes after the shooting some officers appeared on the scene, among them Captain Kiely of the metropolitan police force, who started in pursuit of appellant, and found him about a block from the house, on the rear of a cooper shop; as he advanced toward

appellant, the latter started toward the back door, but the captain ordered him to halt, and, drawing his revolver, took him into custody. The prisoner was taken first to the scene of the homicide, where he asked permission to kiss the corpse, and thence to the police station. In answer to the captain's query as to why he had shot the woman, he replied, "Well, a little trouble; a little jealousy, that's all." He was found to be seriously injured, and was sent to the city hospital for treatment, where he was examined by the surgeon in charge. He had a gunshot wound of the head—the skull was partially fractured, and some of the bone was removed with one of the bullets. About four weeks afterward he was transferred to the jail.

The autopsy of deceased disclosed that she had a gunshot wound of the head situated upon the left side immediately above the ear; the bullet entered the temporal bone ranging inward and slightly downward, passed through the temporal lobe of the left hemisphere and was embedded in the base of the brain, cutting the meningeal artery, suffusing the cranial cavity with blood, and causing certain and almost instantaneous death.

The testimony on the part of the appellant was in support of the plea of insanity, and tended to show that he had received sundry injuries to his head in his childhood; had had spasms of some kind in early infancy; had been sunstruck once upon a time; had practiced a secret vice; had exhibited manifold eccentricities, and had been generally regarded among his relatives and associates as crazy; that shortly before the homicide his peculiar vagaries were manifested in an unusual degree, and that a night or two before the shooting he was troubled with insomnia, gave evidence of strange delusions, and was particularly restless and excited; that during the confinement in jail he had

been exceedingly filthy and loathsome; very profane and obscene in conversation; given to very disgusting practices; had persistently torn his clothing and bedding to pieces; snarled and spit at all who came near him or spoke to him; manifested intense hostility to every one, and utter indifference as to his fate. Experts of acknowledged reputation gave opinions that he was presently insane, and, also, upon hypothetical questions, that he was insane at the time of the homicide.

For the state, in rebuttal, there was testimony to the effect that very soon after appellant was sent to the city hospital for treatment he attempted to escape; that in less than a month after he was sent to the insane asylum pursuant to the first finding regarding his sanity he made an escape in the nighttime (with some other prisoners under observation) and went to his mother's home, several miles away, in north St. Louis, where he was found hiding in a hay loft and returned to the asylum; and that shortly afterward he made another attempt to escape; that upon the second trial to determine his mental condition, after the jury had retired to consider their verdict, he had a conversation with a newspaper reporter, during which he complained that his attorneys had not brought out all the points in his favor, yet claimed that there would be a mistrial, as he had "sized up" one of the jurors and knew that he was soft-hearted and favorable to him; that during appellant's stay at the asylum he was under the constant observation of the superintendent and his assistant by day and by night, and also of the night attendant in charge of the prisoner's ward, and that at no time did he exhibit the symptoms of any known or recognized form of insanity, but on the contrary all his conduct and conversation was that of a

perfectly sane person; that he often referred to his case and declared that no jury would ever hang a man who had been in an insane asylum, and was anxious to be transferred to the jail and stand trial. The asylum physicians testified that in their opinion he must have been sane at the time of the homicide, as did other experts. And it was further shown that for nearly a year preceding the shooting he had been steadily employed as clerk and salesman in a retail grocery, and during all that time never gave any indication to his employer or associates of any mental trouble. To further disprove insanity at the time of the killing, the state introduced a great number of letters and notes of appellant to deceased, covering several weeks prior to the homicide; which were read to the jury with the consent and by the desire of the appellant.

The court thereupon instructed the jury as to murder in the first degree, as to the law of insanity as a defense, the credibility of witnesses and reasonable doubt.

The motion for new trial was based upon the ground that the verdict was against the evidence and against the law, as given by the court; that the court erred in refusing the instruction asked by the appellant, in giving the instructions of its own motion and in admitting illegal and irrelevant testimony; also, that the state's counsel was guilty of gross misconduct in his argument to the jury. The motion in arrest assailed the validity of the indictment.

The counsel who tried the case and perfected the appeal have withdrawn from the case and the grounds urged by them for a new trial have not been pressed by the counsel now in charge of the case either orally or in brief, but the contention of the present counsel is that the sentence should be reversed and a new trial

awarded because of the inefficient and negligent defense interposed by defendant's attorneys in the criminal court.

I. Notwithstanding no stress is laid upon the grounds set out in the motions for new trial and in arrest, we have, according to our practice, considered all of them.

The indictment is full, specific, and contains all the formal averments essential to a charge of murder in the first degree, and is such as has been often approved by this court. The evidence was abundant to establish that defendant shot and killed the deceased with a deadly weapon on account of jealousy and because she had repulsed his suit for her affection, and that there was no evidence whatever of provocation to reduce the grade of homicide below murder in the first degree. There is nothing in the record to substantiate the charge of misconduct on the part of the prosecuting officer. The instructions given by the court were elaborate, embracing every phase of the evidence, and were correct expositions of the law applicable to the facts, and have heretofore received the sanction of this court. The refusal of the only instruction asked by defendant was not error, for the simple reason that the court in its instruction number 7 had already given it in almost the identical words.

Without enumerating all the objections to evidence on the part of the state it is sufficient to say that no ground was assigned for many of them, and when the objections were overruled no exceptions were saved. Several objections thus made were afterward withdrawn but it is not necessary to sustain the action of the court on technical grounds. We have carefully examined each objection on its merits and we are satisfied no error was committed in this regard. The broadest latitude was accorded counsel in supporting

his plea of insanity.    No complaint is made of the improper rejection of testimony in defendant's behalf.

II.    We are brought now to consider the proposition of the present counsel in the case that a new trial should be awarded because the management of the case by defendant's attorneys in the court below was totally lacking in skill and care so that by reason of the inefficiency of the attorney defendant did not have a fair trial.

This criticism of the counsel who conducted the defense is founded upon the alleged failure of said counsel to consult with defendant's witnesses before they came into court, and his failure to subpoena the relatives of defendant to testify on the preliminary trial of his sanity; that, by reason of not consulting the witnesses, several of the witnesses testified defendant was insane but gave trivial and ridiculous reasons for their opinions.    Another alleged oversight was the placing of the experts on the stand before he had fully developed the defense by other non-expert witnesses. Much censure is indulged also because of the facts assumed in the hypothetical questions, and the omission therefrom of many facts deemed by the present attorney as greatly strengthening the case; and another criticism of counsel is because he misunderstood an oral ruling of the judge.    The foregoing is a fair summary of the reasons why the inefficiency' of the lawyer who tried the case should secure a reversal by this court.

Before indulging in censure of the counsel who defended this case it must always be remembered that he rendered the service to the defendant without fee or reward or the hope thereof.    At the behest of the court he assumed the onerous task of defending the defendant against the gravest of charges.    He was not supplied with funds from the public or the relatives of defendant with which to prosecute his inquiries or to

aid him in securing the services of others to look up evidences of insanity, for it is conceded that no other plea offered the slightest hope of an acquittal.   The record is silent as to when Judge Harvey appointed the counsel to defend the prisoner.   But assuming, as we do, that he had been appointed prior to the time of the preliminary trial of his sanity, and that his relations were not summoned to that inquisition, these relations had not been with the defendant during his incarceration in the asylum; and it might well be that counsel for defendant was aware that on that issue they would be wholly incompetent for the reason that they had no opportunity to observe his recent condition and hence could express no opinion on his then sanity and the result of that trial could not affect his liberty.   We think the charge of inefficiency on this ground is not sustained.

But it is said that Mr. Adams, charged with the grave responsibility of defending this man, "had absolutely no interviews, no consultations, no conversations whatever with any of appellant's witnesses until they came into court to testify."   Mr. Adams' evidence, upon which the charge is based, was that he "did not converse with the witnesses until they were subpoenaed to the court."   "Of course " he says, "I have had conversations with them in the witness room, inquiring what they would testify to to enable me to conduct the defense in this case."   This is the sum of the evidence on this point.   The record completely disproves the charge of failing to interrogate the witnesses before they went on the stand.   It is evident that somehow he ascertained that these witnesses knew the defendant and were well disposed to him and that they would testify as they did to many strange and erratic sayings and doings of defendant and he had brought them to

court and had conversed with them before offering them.

But a rather remarkable part of the charge against the attorney is that several of these witnesses were actually allowed to testify in behalf of defendant that he was insane when as a matter of fact they gave no good or sound reasons therefor. They did not surprise the counsel and testify for the state but he was somehow shrewd enough to get their opinions before the jury without detailing enough facts to justify them in giving an opinion. We are clearly of the opinion that this specification furnishes its own refutation.

Again, the present counsel for defendant complains that the attorney who tried the case to the jury was greatly wanting in skill because he placed his two well known and distinguished alienists on the stand and propounded to them a hypothetical question on the evidence produced up to that time and did not wait until he had developed the whole defense. But did this result in injury? Certainly not. The counsel at least seems to have understood his expert witnesses because when his question was propounded they promptly answered the defendant was insane. Why pile *Pelion* upon *Ossa?* He seems to have learned when he had enough. The evidence of "the other disinterested witnesses, jail guards, doctors, and others" was none the less obligatory upon the jury to consider because it was not included in the hypothetical question. The counsel for defendant might, without being guilty of stupidity or want of skill, have reasoned that many jurors are prejudiced against expert evidence and that while he might avail himself of it yet he would supplement it with the evidence of other disinterested witnesses who knew the facts and gave their opinion based upon the facts.

It would establish a dangerous precedent should

we assume to condemn unheard any lawyer because of the manner in which his evidence was unfolded before a jury. One thing is apparent, that the counsel who tried this case managed to get before the jury exceedingly strong evidence of insanity. Few cases upon the records of this court will show so much. It is certainly not to be charged to his account that the jury did not believe these witnesses. If he did nothing else he seems to have convinced his successor, the present counsel in the case, that upon the facts disclosed he ought to have obtained an acquittal.

We have gone seriously into an examination of this record and we think that the effort to obtain a new trial on account of the inefficiency of the counsel who defended in the criminal court is without any just basis.

But we are not to be understood as consenting that even if there had been negligence or want of skill it would have afforded any ground for reversal. The neglect of an attorney is the neglect of his client in respect to the court and his adversary. The decisions are too numerous to cite; but their uniform tenor is to the effect that neither ignorance, blunders nor misapprehension of counsel not occasioned by his adversary is ground for setting aside a judgment or awarding a new trial. *Field v. Matson*, 8 Mo. 686; *Gehrke v. Jod*, 59 Mo. 522. The rule is founded upon the wisest public policy. To permit clients to seek relief against their adversaries upon the alleged negligence or blunders of their own attorneys would open the door to collusions and would lead to endless confusion in the administration of justice. The business of the courts can not be conducted on any other terms than that parties must be held by the acts of their attorneys in their behalf in causes in which they are authorized to appear, and in

the absence of fraud leaving the client to his remedy against the attorney for his negligence.

After a most laborious search we have found but one case in which an appellate court has reversed a sentence or judgment on the ground of the negligence or incompetency of an attorney. That case is *State v. Jones*, 12 Mo. App. 93. In that case no authority was found upon which to base the ruling and we can not find that it has ever been followed in this or any other state. We readily agree with the learned court that decided that case that the record presented a most lamentable example of ignorance and incompetency and that the trial court should have afforded the remedy by setting aside the verdict and appointing a competent attorney for the prisoner; but we think that the court of appeals in that case suffered a hard case to make bad law and ignored the fact that it was a court for the review of errors only and that it was confined to such errors as appeared on the record proper and to such exceptions as had been ruled on by the trial court. For the distinguished jurist who wrote that opinion and his associates we have the profoundest respect. We doubt not that in that individual instance, their judgment wrought justice but we can not give it our sanction as a rule of practice or procedure and it is accordingly disapproved.

We are bound to presume that the court which appointed the counsel to defend the prisoner in this case knew him to be a reputable member of the bar and that it discovered nothing in his conduct calling for his displacement and the appointment of another in his stead. To sustain this contention would be to condemn the counsel who gave defendant his services without reward without according him a hearing in a matter vitally affecting his professional standing and would be an indirect censure of the court who was a witness to

his conduct throughout the trial. We will not do either.

While there was much evidence from which the jury might have found defendant insane there was fully as much that tended to prove he committed the murder through jealousy and that he was perfectly conscious of the nature of his act and knew the right from the wrong of that act. The issue was fairly submitted to an impartial jury and they found against his plea and in the absence of an error of law impelling that verdict it must stand. The judgment is affirmed and the sentence of the law will be carried into execution. SHERWOOD and BURGESS, JJ., concur.