# STATE *v.* JUKICH

## No. 2702

January 12, 1926.                                      242 P. 590.

1. HOMICIDE—EVIDENCE HELD TO SUPPORT CONVICTION OF MURDER
   IN FIRST DEGREE.
   Evidence *held* sufficient to support conviction of murder in
   first degree.

2. HOMICIDE—WHETHER ACCUSED'S TESTIMONY THAT HE WAS SO
   INTOXICATED AS TO BE UNCONSCIOUS OF WHAT HE WAS DOING
   WAS TRUE HELD FACT FOR JURY.
   In prosecution for murder, whether accused's testimony that
   he was so intoxicated as to be unconscious of what he was
   doing was true was question for jury.

3. CRIMINAL LAW — NEW TRIAL SHOULD NOT BE GRANTED FOR
   INCOMPETENCY OR NEGLECT OF ACCUSED'S COUNSEL, UNLESS
   ACCUSED IS PREJUDICED AND DEPRIVED OF FAIR TRIAL.
   New trial should not be ordered by appellate court because
   · of incompetency or neglect of accused's counsel, unless it is
   such that accused was prejudiced and thereby deprived of fair
   trial.

4. CRIMINAL LAW—FAILURE OF ACCUSED'S COUNSEL TO MOVE FOR
   CHANGE OF VENUE HELD NOT SUCH INCOMPETENCY OR NEGLECT
   AS WARRANTS REVERSAL OF CONVICTION.
   In prosecution for murder, failure of counsel to move for
   change of venue *held* not such negligence and incompetency as
   warrants reversal of conviction.

5. CRIMINAL LAW—EXAMINATION OF JUROR ON VOIR DIRE HELD NOT
   TO DISCLOSE SUCH NEGLIGENCE AND INCOMPETENCE OF COUNSEL
   AS TO REQUIRE REVERSAL.
   Examination of jurors on voir dire by counsel for defendant
   in murder trial *held* not to show such negligence and incom-
   petence of counsel as to warrant reversal of conviction.

6. CRIMINAL LAW—FAILURE OF ACCUSED'S COUNSEL TO OBJECT TO
   IMMATERIAL EVIDENCE HELD NOT TO SHOW SUCH INCOMPETENCY
   AS WOULD WARRANT REVERSAL OF CONVICTION.
   In prosecution for murder, failure of accused's attorney to
   object to admission of immaterial evidence *held* not to indicate
   such neglect and incompetency as would warrant reversal of
   conviction.

7. CRIMINAL LAW—FAILURE OF ACCUSED'S COUNSEL TO EXAMINE
   NINE-YEAR-OLD WITNESS FOR STATE AS TO COMPETENCY HELD
   NOT SUCH NEGLECT AND INCOMPETENCY AS WOULD WARRANT
   REVERSAL OF CONVICTION.
   In prosecution for murder, failure of accused's counsel to
   examine child witness as to her competency, in view of her
   · testimony, *held* not to show such neglect and incompetency by
   accused's counsel as would warrant reversal of conviction,
   since court is primarily charged with duty of determining ·
   competency in such cases.

8. CRIMINAL LAW—ON APPEAL IT WILL BE PRESUMED THAT COURT FOUND CHILD WITNESS COMPETENT.

On appeal it will be presumed that court was convinced that child witness was competent.

9. CRIMINAL LAW—TESTIMONY SHOWING MOTIVE ELICITED FROM ACCUSED BY HIS ATTORNEY HELD NOT TO SHOW SUCH INCOMPETENCY AS TO WARRANT REVERSAL OF CONVICTION.

In prosecution for murder, testimony of accused elicited by his counsel, although harmful, as disclosing motive, in view of fact that state had introduced accused's statements to same effect, was not prejudicial, and did not show such incompetency of accused's counsel as would warrant reversal of conviction.

10. CRIMINAL LAW—FACT THAT ACCUSED'S COUNSEL DEFENDED ON GROUND OF EXTREME DRUNKENNESS AND LACK OF INTENT HELD NOT TO SHOW SUCH INCOMPETENCY AS TO WARRANT REVERSAL OF CONVICTION.

In prosecution for murder, fact that accused's counsel defended on wrong theory of extreme drunkenness and lack of intent, in absence of showing that accused had any other defense, was not such incompetency as to warrant reversal of conviction.

11. CRIMINAL LAW—IN ABSENCE OF OBJECTIONS, ERRORS IN ADMITTING EVIDENCE ARE NOT REVIEWABLE EVEN IN CAPITAL CASES.

The rule that errors in admission of improper evidence are not reviewable unless objected to on trial applies to capital cases.

12. CRIMINAL LAW—INSTRUCTION DEFINING MURDER IN FIRST DEGREE HELD NOT TO INDICATE OPINION, IN VIEW OF OTHER INSTRUCTIONS.

Instruction on kinds of first degree murder, though somewhat ambiguous, *held* not misleading, as indicating court's view that facts showed premeditation and deliberation, in view of other instruction requiring proof of such elements beyond reasonable doubt.

13. CRIMINAL LAW—INSTRUCTION AS TO EFFECT OF DRUNKENNESS ON LIABILITY FOR KILLING HELD PROPER.

In prosecution for murder, instructions that evidence of drunkenness must be received with caution, and as to effect of drunkenness on liability for offense and as affecting degree thereof, *held* proper.

14. HOMICIDE—EVIDENCE OF DRUNKENNESS SHOULD BE RECEIVED WITH CAUTION.

As general rule, in cases of homicide evidence of drunkenness should be received with caution.

15. CRIMINAL LAW—IF EVIDENCE IS OF SUCH CHARACTER THAT ITS WEIGHT MAY BE EASILY MISJUDGED, COURT MAY PROPERLY ADVISE THAT IT SHOULD BE "RECEIVED WITH GREAT CAUTION."

When evidence is of such character that its weight may be easily misjudged, it is proper for court to advise that it should be received with great caution, which does not mean that it is

not entitled to credit even if believed, but merely that it should be weighed with care.

See (1, 2, 14) 29 C. J. sec. 21, p. 1061, n. 23; 30 C. J. sec. 559, p. 312, n. 42; sec. 585, p. 333, n. 44; sec. 590, p. 336, n. 79; sec. 614, p. 361, n. 40, p. 362, n. 51; sec. 646, p. 402, n. 78; (3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 15) 16 C. J. sec. 2642, p. 1145, n. 37, 39, 40, 41 (new), 42; 17 C. J. sec. 3331, p. 56, n. 16; sec. 3569, p. 223, n. 37; sec. 3754, p. 369, n. 26, p. 595, n. 26.

APPEAL from Ninth Judicial District Court, White Pine County; *C. J. McFadden,* Judge.

Stanko Jukich was convicted of murder in the first degree, and he appeals. **Affirmed, with directions. Rehearing denied.**

*King & Schulder* and *C. E. Handwright,* for Appellant:

Defendant was deprived of constitutional right in not having had testimony interpreted to him in language he understood.

There is no evidence of premeditation and deliberation, the very essence of first degree murder. It is incumbent on state to show defendant was of sound mind and disposing memory to justify that degree. One so intoxicated as to be incapable of rational thinking cannot premeditate or deliberate. 13 R. C. L. 710; Utah v. Anselmo, 148 P. 1079.

Negligence or incompetence of defendant's counsel which prevents fair trial warrants reversal. State v. Swayze, 30 La. Ann. 1323; State v. Jones, 12 Mo. App. 93.

Appellate courts, especially in capital cases, will examine into and correct errors, though not properly assigned, which affect substantial rights of defendant. This is exception to general rule. 17 C. J. 50; Fritz v. State, 128 P. 170; Wiborg v. U. S., 163 U. S. 632; Anthony v. State, 159 P. 934.

*M. A. Diskin,* Attorney-General, and *H. W. Edwards,* District Attorney, for the State:

Defendant understood and spoke English. It was his duty, if he did not understand testimony, to call court's

attention to fact. He cannot remain silent and in case of unfavorable verdict ask for second trial with interpreter. State v. Cabodi, 138 P. 262; State v. Rusos, 219 P. 843.

Evidence was that defendant was not intoxicated. No insane, irresistible impulse was shown. Instruction on insanity was properly refused. Court is bound to instruct on defendant's theory only when facts warrant it. 13 R. C. L. 933; 30 C. J. 359.

Defendant received as good defense as crime afforded. Only conclusion possible to unbiased mind is that only error committed was that of defendant in shooting to death little fifteen-year-old girl.

## OPINION

By the Court, DUCKER, J.:

Appellant was convicted of the crime of murder of the first degree, and the penalty of death was imposed. He appeals from the judgment and order denying his motion for a new trial. The grounds urged on this appeal for a reversal of the judgment may be grouped under three heads, namely, insufficiency of the evidence to support the verdict of murder of the first degree; incompetency of counsel who represented appellant in the court below; and misdirection of the jury by the court. These will be considered in the order stated.

On the 14th day of February, 1925, at the home of her parents in Ruth, White Pine County, Nevada, appellant shot and killed Jennie Madek, a young girl between 15 and 16 years of age. The parents of the deceased and the appellant are natives of Jugo-Slavia. The appellant is 28 years of age, and had lived in White Pine County for about 11 years before the killing. For about two months immediately prior thereto he had been at Gold Hill, Nevada, and returned to Ruth the day before the homicide. He had boarded with the parents of the deceased for about 18 months prior to his leaving Ruth for Gold Hill. The circumstances immediately surrounding the killing are as follows:

Appellant came to the house where the girl lived at

about 3 o'clock in the afternoon and remained there until he killed her four or five hours later. Besides the appellant there were four eyewitnesses to the shooting— the mother and a sister of the deceased, Mrs. Madek and Katie Madek, a girl 9 years of age, and two Americans whose names are Alfred Le Prowse and W. C. Mosher. Le Prowse and Mosher came to the Madek house five or ten minutes before the shooting took place. They came there to get a drink of wine, and found the persons named present, including an infant child of the Madeks. They had two drinks of wine. Appellant joined them in the last drink, and drank about a fourth of a glass. There is little difference in their testimony. Appellant was standing about four feet from Jennie when he suddenly pulled his gun and shot her. Prior to the shooting they did not hear appellant say anything to Jennie, but Le Prowse testified he had heard appellant talking to Mrs. Madek in a foreign language. Both witnesses testified that they saw no signs of anger on the part of the appellant or the others. Mosher testified that appellant appeared to be normal and that he saw no evidence of his being badly intoxicated. Both witnesses left the house immediately after the shot was fired, and Mosher testified that he heard the report of a second shot just as they were leaving the house. Katie Madek in her testimony gave the following version of the circumstances of the shooting:

"I was in my father's house the night Jennie was shot. My mother and two Americans and Stanko and my little brother were there. Brother is a baby 2½ years old. My sister was standing by two doors wiping my father's bucket. Stanko was sitting on a chair, and he got up and stood by the stove. He put his foot on the chair, and his left hand was in his left coat pocket. He was talking when two Americans came in. They asked Stanko if he had any wine, and he said, 'Just a glass of water.' My mother gave the two men a glass of wine. They drank just one glass, and my mother said, 'I forgot Stanko,' and gave him a glass of wine. He drank just three drops. He did not act like he was

mad at any one and did not use any bad language at any time. He did not say anything to Jennie. Stanko pulled his left hand out of his pocket and shot her in the breast. Jennie fell down. She tried to get up two times but couldn't. My mother took his arm, and he shot in the roof. Two times he shot. My mother held his hand, and when he shot he opened the door and ran out, and—well, he was going to shoot me and the gun wouldn't shoot, and then he hit me and skinned my nose. He came back again to see if Jennie was dead. When he came back to Jennie the second time he shot at her, and the gun wouldn't work, and he kicked Jennie in the head and went out."

Mrs. Madek, the mother of the deceased, testified substantially as follows: Appellant started to board with her on the 25th day of June, 1923, and left her boarding place on the 26th day of December, 1924. He came to the house on the afternoon of the 14th of February, 1925, with one Mike Smilanick, at about 3 o'clock in the afternoon. The latter remained until her husband got home from work. He stayed there all the time until he shot Jennie. He did not quarrel with anybody in the house and showed no sign of being angry about anything. Just before the shooting he was sitting on a chair and got up and stood in front of the door. He made one step towards Jennie and shot her. Mrs. Madek jumped at him and appellant said, "You are finished also." She grabbed him by the hand, and the bullet went straight into the ceiling. Finding that she could not do anything with him she ran out of the house calling for help. After he fired the second shot he was pulling at the trigger. He held the gun in his left hand. The second shot hit the witness on the little finger. Before he shot Jennie he had been talking of his marriage. He said that a fellow in Virginia City was his best man, and his wife was there. Before the shooting he had been talking to Jennie in a nice way, and she asked him why he did not bring his wife out. He replied that he could not until he had a house and a job. The witness gave appellant three drinks of wine. She stated that he was not drunk.

After the shooting the appellant went to the house of one Tartan, and said he had killed that girl. He gave the gun to Tartan, and was shortly afterwards taken into custody by a deputy sheriff. The officer asked him what he had done, and he said he had killed a girl. Asked why he did it, he said she would not marry him, and he was ready to go too. The officer put him in a car and took him to jail. While on the way there the officer said he asked appellant why he killed the girl, and he replied, "If I couldn't have her nobody else could," and kept saying, "Goodbye, sweetheart."

Questioned concerning his condition, the officer testified that he appeared to be normal; that he would judge he had been drinking a little, but was sober and normal and did not appear to be excited. Another deputy sheriff, who was present when appellant was taken into custody and who went in the car with him to the jail, testified that appellant did not seem to be drunk, and that he did not smell any liquor on him. Concerning statements made to him at the time by the appellant, the following questions were asked and answers made:

"Q. What did he say to you? A. * * * We went into the house and sat down, and I says, 'Why did you kill the girl?' He says, 'They promised me the girl— we had a written agreement'—and then began rambling.

"Q. Did he say written agreement? A. Yes; he said the parents of the girl and him signed the agreement that he was to marry the girl when she became a little older.

"Q. Did he exhibit any remorse over his action? A. None.

"Q. What did he assign for his reason for killing her? Did he say anything about 'If I can't have her no one else can'? A. He mentioned that as we came down; I believe he said that coming down in the car—it appears to me, but I am not quite positive. But he mentioned that anyway that evening."

The appellant was taken to jail, and later in the evening was taken by a deputy sheriff to the office of the district attorney, where he made a statement which was taken down by a stenographer. The statement was

transcribed by the stenographer and the transcript introduced in evidence. It is as follows:

"Statement of Sam Jukich:

"Mr. Edwards: Sam, you know who I am, of course? A. I know who you are; I'll tell you everything.

"Q. You don't have to tell me anything if you don't want to. I am investigating this trouble you had up at Ruth. If you want to tell me anything you can; but anything that you do tell me will be used against you. A. Yes, sir; I tell you everything.

"Q. What was the girl's name? A. Jennie Madek.

"Q. Just tell me how this thing happened. A. Well, it was a little over two years ago, and I came to her mother, and her mother had a little house to fix, and it wasn't in good shape, and they were going to fix it a little; I was going to fix that house, and we was talking about it, and so after a while she was going to promise to give me her daughter. And her daughter was in the front room and everything was O. K. Her mother said, 'Which one do you want?' and I said, 'The one that is the first to get married.'

"Q. You wanted the oldest one? A. Yes. Her godfather was in the front room, and her mother and her went in the front room, and I don't know what they said, and she came out and said, 'I am going to be your wife any time from now; as soon as I get big enough to get married.' And I got her godfather to witness it. Something like two or three months ago her mother and father sent her to Washington; just wanted to bluff me because I spent all my money, and I was supporting her with clothes and everything else, and as soon as she got a little bigger, she went to Washington, and then I went away and as soon as I left her mother went after her to bring her back.

"Morris Roberts: You came in from Gold Hill last night, didn't you? A. Yes; I came back from Gold Hill last night, and I was talking to her about her promise, and she said, 'I don't know.' I said, 'Tell me what has happened; don't you remember when you promised to be mine?' And I said, 'What has happened that you

refuse me?' And she said, 'I don't know.' Then I got excited and I shoot.

"Q. Did you shoot her because she said she didn't know? A. But she did know.

"Q. Was there any one there at the time? A. Two American fellows; I don't know their names.

"Q. Just the two American fellows and the girl and some other children and her mother was there? A. Yes; they were there.

"Q. How many times did you shoot her? A. Once.

"Q. Is the girl dead?

"Morris Roberts: Yes, she is dead.

"Q. Where did this happen?

"Morris Roberts: In the Madek house in Ruth.

"Q. You wasn't drinking, was you? A. Yes; we were drinking.

"Q. You were not drunk? A. Well; I was drinking.

"Q. You are sober now; did you know what you were talking about? A. Yes, sir.

"Q. What did you do with the gun after you shot the girl? A. After I shot her I went outside, and I threw it away about 20 yards from the house.

"Q. What kind of a gun was it? A. A 25 automatic.

"Q. What you just told me, Sam, you told of your own free will? You told it to me without me making you tell anything, is that it? A. I don't understand.

"Morris Roberts: You wanted to tell the district attorney what you told? You wanted to tell him the truth? A. Yes; it's the truth; I just tell the truth."

The appellant was a witness in his own behalf, and testified at length. His testimony covers 43 pages of the record. A large part of it is devoted to a marriage agreement which he claims was made with him by the girl and her parents by which he was to have her in marriage; how in pursuance of this agreement he bought all of the girl's clothes and gave her money; how he furnished the material to build another room to the Madek home in which they were to live after marriage until they could get another room; and to the breaking of the agreement by the girl and her parents.

He testified that he had no ill will towards the girl for breaking the engagement, and told her that he did not care and would get another girl. He asked her who would return to him the money he had expended on her. He also asked the girl's mother to return the money. He declared that he had expended all of his money for her except the money he needed for his board. He testified that after he left Ruth, and went to Gold Hill he became engaged to a girl at the latter place and married her; that he was unable to get a marriage license; that he tried to get one at Virginia City and at Carson City, and was told that a license could not be obtained because the girl was under age; that he considered himself married to the girl. He told her he was going to Ruth and that when he got a house and a job he would send her a ticket to come to him, and she said, "All right." He told her he was going to Ely to get a marriage license.

Concerning the incidents on the night of the shooting and the afternoon preceding, he gave substantially the following version: He was going to work in the morning and was going to Mrs. Madek's house to get his lunch bucket, which he left there before he went to Gold Hill. Mike Smilanick went with him. He asked Mrs. Madek for his lunch bucket, and she said, "All right." She asked him if he was married; he told her that he was and started to leave. She asked him to have a drink, and brought in a half gallon of moonshine. Appellant, Smilanick, and one Luchich drank all of it and paid for it. Another half gallon of moonshine was brought in. They drank some of it, but appellant could not remember whether all of it was consumed or not. His bucket was on the table and he picked it up and was going when Mrs. Madek said: "Stay a little longer; you have plenty of time to go." As far as he knew he drank no wine at the house that day. The last event appellant could remember was the Madek family having supper shortly after the second gallon of moonshine was brought out. His attention was called to the testimony of the witness Le Prowse and Mosher, and he was asked if they were in the house that day. He replied, "I don't

know." He remembered nothing of the shooting, or of being taken to jail, or of making any statements concerning the shooting. He was sober when he reached the house and had a gun in his right-hand pants pocket. It was customary with him to carry a gun. On redirect examination he testified that Mrs. Madek ran a bootleg joint in her home, and that he and others had bought moonshine whisky there on other occasions. He also testified that it was customary for people of his nationality to make agreements to marry the oldest daughter, and that such agreements were generally considered binding.

No witnesses testified in behalf of appellant concerning the circumstances of the shooting. Smilanick, who went with appellant to the house, was a witness in his behalf, and said that he stayed there for half and hour or so; that they had some kind of liquor to drink which looked and tasted like moonshine. He saw the appellant take one drink. Neither he nor the appellant paid for the drinks. George Jukich testified that he had been to Mrs. Madek's house about two years before the trial a number of times when appellant was present and drank moonshine whisky on those occasions.

Tom Zupin testified to having been at the house three or four different times, and to drinking wine and moonshine whisky. He paid Mrs. Madek two bits a drink for it. The last time he had liquor there was about two months before the trial.

Mrs. Mike Delich, another of appellant's witnesses, testified that she lived next door to Mrs. Madek; that appellant came to her house on the 14th of February last, and stayed somewhere near a half or three quarters of an hour; that he drank a bottle of wine while there; that he did not talk about the Madek family and did not seem to be angry; and that when he left there he told her that he was going to Mrs. Madek's to get his bucket, as he was going to work in the morning. The witness also said that Jennie was a well dressed girl compared to other girls in Ruth; and that she was the best dressed girl.

Vide Mommich, a witness for appellant, corroborated

him as to the marriage agreement, and also said that he heard Jennie asking him for money to buy dresses. A witness by the name of Joe Miller testified to statements made to him by Mrs. Madek to the effect that she had detained appellant by talking to him when he came to the house for the lunch bucket.

Another witness, also named Joe Miller, testified that on the night of the 13th of February appellant asked him for a job. He told appellant that there was a vacant place, and he would speak to the foreman for him.

In rebuttal for the state, Mrs. C. L. Grier testified that she had charge of a department in the J. C. Penny Company. She was acquainted with Mrs. Madek and Jennie Madek. They came into her department last graduation time. The latter bought a dress, and the mother paid for it. The selling price was $19.19.

Pete Lukich, in rebuttal, said that he was in the Madek house on the 14th of February from 2 o'clock to about 10 minutes after 5. He drank no whisky in that house on that day. He had a glass of wine. He saw no whisky in the house that afternoon. Mrs. Madek was also called in rebuttal. She said that appellant did not give her the money to buy Jennie's graduation dress. She bought it for Jennie and paid $20 for it. She denied that appellant had ever demanded $500 from her for clothes he had bought for Jennie. She denied that appellant ever bought her daughter as much as nine dresses in two years, or fifteen pairs of stockings that cost $2.50 a pair. She also denied having signed any written agreement that Jennie was to marry appellant as he had stated in his testimony. She also denied that she had brought out the half gallon of whisky as he had claimed. Formerly, on her cross-examination, she testified that she never promised Jennie to appellant, and that he never bought her any clothes or anything of the kind. She also testified on cross-examination that appellant spent no money in her house on the 14th of February, and that he had wine to drink..

Some of the testimony we have set out has no bearing on the guilt or innocence of the appellant, and has been

stated in view of another assignment of error which we will next discuss.

1.   There is ample evidence to support the verdict of murder in the first degree.  The killing of the girl by appellant was established and not denied by him.  He simply said that he did not know that he killed the girl or what he did or said on the afternoon or night from the time he drank a certain quantity of liquor.  Consequently the circumstances of the killing and his statements concerning it as detailed by the witnesses for the prosecution were in nowise contradicted.  The appellant, as the evidence shows, came to the house armed with a deadly weapon concealed upon his person.  Without provocation he used it with fatal effect upon an innocent young girl.  He attempted to kill the mother and a younger sister.  According to the testimony of the latter he struck her and kicked the prostrate form of the girl he had shot and killed.  He told the arresting officers that he killed her because she would not marry him and to keep any one else from having her.  He told the district attorney shortly after the shooting that she had previously promised to marry him; that her mother had promised her to him, and he had spent all of his money on her; and that on the night of the killing when he reproached her for breaking her promise and she told him she did not know why she refused him, he got excited and commenced to' shoot.  His statements disclosed a motive of revenge, and from all of the circumstances the jury was warranted in concluding that the killing was done with malice and deliberation.

2.   Whether appellant's testimony to the effect that he was so intoxicated as to be unconscious of what he was doing was true or not was for the jury to determine, and was resolved against him by the verdict.

Counsel for the appellant in this court did not represent him at the trial of the case, and they contend that his counsel in the court below handled the case so negligently and unskillfully as to deprive him of the fair and impartial trial guaranteed by law and the constitution. In support of this contention they point out that no

motion for a change of venue was made, and insist that the record discloses that there was no proper examination of the jurors on their voir dire to ascertain their qualifications and state of mind towards the appellant; that no challenges were interposed by him to any of the jurors finally sworn to try the case; that the jury was obtained hurriedly and the trial finished with unusual expedition; that no objections were interposed to leading and other questions by the district attorney which elicited testimony and evidence inadmissible and prejudicial to appellant; that appellant's counsel did not question the nine-year-old daughter of the Madeks to test her capacity to testify as a witness; and that he defended the case upon the wrong theory and drew from the appellant and other witnesses in his behalf testimony prejudicial to him. Upon these alleged shortcomings counsel here make a strong appeal for the reversal of the judgment. Whether appellant would have fared better under the guidance of other counsel is, of course, entirely speculative, but, in view of the evidence upon which the jury found him guilty, it is safe to say that he might have been convicted even if counsel of great skill had defended him in the court below.

3. Ordinarily, the negligence or unskillfulness of counsel for a defendant in a criminal case is no ground for a reversal. State v. Dreher, 137 Mo. 11, 38 S. W. 567; Sayre v. Commonwealth, 194 Ky. 338, 238 S. W. 737, 24 A. L. R. 1017; Commonwealth v. Dascalakis, 246 Mass. 12, 140 N. E. 470; State v. Benge, 61 Iowa, 658, 17 N. W. 100; State v. Dangelo, 182 Iowa, 1253, 166 N. W. 587; Husdon v. State, 76 Ga. 727; Darby v. State, 79 Ga. 63, 3 S. E. 663. The contrary has been rarely held. It was so held in State v. Jones, 12 Mo. App. 93, but the Supreme Court of Missouri in State v. Dreher, 137 Mo. 11, 38 S. W. 567, refused to sanction the ruling, notwithstanding, as it admitted, the record in the former case presented "a most lamentable example of ignorance and incompetency, and that the trial court should have afforded the remedy by setting aside the

verdict and appointing a competent attorney for the prisoner."

We had occasion to say in State v. Clarke, 228 P. 582, that a case might be presented in which an appellate court would probably feel that it was its duty to set aside a conviction for errors committed by the trial court resulting in an unfair trial of the defendant, although no objection or exception was made or taken to the improper admission or exclusion of evidence because of the mistake or misconduct, neglect or incompetency of his counsel. We had in view, of course an extreme case. In such a case this court would not feel bound by rules of procedure to permit a palpable miscarriage of justice. The common dictates of humanity would prescribe such a course, especially where human life is involved. It is to be noted that in State v. Dreher, supra, which was a capital case, the court reviewed the record, and said:

" * * * We think that the effort to obtain a new trial on account of the insufficiency of the counsel who defended in the criminal court is without any just basis."

In Sayre v. Commonwealth, supra, also a capital case, the record was reviewed, and it was held that there was no error of such seriousness or prejudice to the legal rights of the defendant as to warrant a reversal. The court said:

"Without overriding the general rule of law applied by this court and others of this country, we cannot reverse the judgment and grant appellant a new trial on the grounds of the incompetency and unskillfulness of appellant's lawyer, for it cannot be said that he has not received a fair and impartial trial."

In State v. Bethune, 93 S. C. 195, 75 S. E. 281, the court, in deciding against the objection of counsel's prejudicial mismanagement of the case, said:

"The mental condition of the appellant's former attorney is not ground for a new trial, because it has not been made to appear that it caused prejudice to his case.

It does not appear that he did or left undone anything which would probably have affected the result."

The Supreme Court, in State v. Dangelo, 182 Iowa, 1253, 166 N. W. 587, in denying a new trial, urged on account of the incompetency of counsel, said:

"We do not say that the rights of the accused may not be so flagrantly disregarded by counsel of his own choosing, and, as a consequence, justice so manifestly miscarry, as that a new trial should be ordered."

In an earlier case the same court, upholding a judgment of conviction where a reversal was urged on the grounds of incompetency of counsel, after stating that the rule was an almost invariable one in civil cases, said:

"In criminal cases, and especially in cases involving the life of the defendant, the court would probably be justified in adhering to the rule somewhat less strictly. State v. Jones, St. Louis Court of Appeals, May No., 1882, Western Jurist, 322. But in any case, to justify a reversal upon this ground, there should be a strong showing both of incompetency and prejudice." State v. Benge, 61 Iowa, 658, 17 N. W. 100.

We think that the rule deducible from these cases is that a new trial should not be granted by an appellate court in a criminal case on account of the incompetency or neglect of counsel unless it is so great that the defendant is prejudiced and thereby deprived of a fair trial. 16 C. J. 1145.

4. There is nothing in the record to disclose such a situation. Counsel in the lower court is criticized for not having made a motion for a change of venue. The crime was indeed a brutal one, but there is nothing to indicate that a fair and impartial jury could not have been obtained, or that any public feeling existed in the community against the accused, or that any hostile feeling had been manifested against him at all. So far as appears, such a motion, if made, would have been properly denied. Counsel was not required to make idle motions.

5.    We find nothing in the claim that the examination of the jurors on the part of appellant revealed inefficiency on the part of his counsel.    True, one of the jurors finally sworn to try the case said, during the course of his examination, that he "thought the appellant should be punished in some manner," and was not challenged by counsel.    The juror had previously stated that he had no opinion as to the guilt or innocence of the accused.    The juror had never served in a criminal case before, and we think his entire examination discloses that he had neither formed nor expressed an unqualified opinion that the accused was guilty of the offense charged, and that he would be guided solely by the evidence and the law as given him by the court.    The examination of the other jurors finally sworn to try the case shows that none of them had an opinion as to the guilt or innocence of the accused.    It further shows they were not prejudiced against him in any way, and were fair and impartial jurors.    Those who on their voir dire stated that they had opinions were promptly challenged by appellant's counsel and excused by the court.    Two were peremptorily challenged by him.

Appellant's counsel asked two of the jurors on their voir dire if they had heard or read anything in the papers regarding the case that would give them the opinion that the judge of the court had expressed an opinion as to the guilt or innocence of the accused. When the question was asked of the second juror the judge interposed and prevented counsel from continuing this line of interrogation, and stated that he had expressed no opinion.    Counsel said:    "This is only asked in all fairness; I don't for a moment think that your honor has expressed an opinion."    It is claimed that counsel's conduct in this respect, evoking a reprimand from the court, had a tendency to prejudice appellant's case.    We fail to see how it could have had any such tendency, or how counsel's examination in this regard can be said to show incompetency.

6.    The argument of appellant's counsel on this appeal

to the effect that the failure of his counsel in the court below to object to many questions asked by the district attorney which it is claimed elicited testimony of a prejudicial nature, and evidence of a similar nature introduced in defense, indicated incompetency, takes a very wide range. We do not propose to follow it and discuss in detail the various questions and responses thereto stressed by counsel. We have examined the entire record in this regard, and do not find anything worthy of serious consideration as sustaining the claim of neglect and incompetency. An attorney's ability cannot be measured by the number of objections he makes. Attorneys of little ability are sometimes prolific in this respect. There is immaterial evidence in the record, but there are few records in criminal cases that are free from this objection. It would probably not have been admitted in the presence of proper objections. We cannot know counsel's reasons for not objecting to some of the questions complained of, but we are not prepared at this distance from the atmosphere of the trial to charge him with neglect or incompetency for not doing so. As said in Commonwealth v. Dascalakis, supra:

"Doubtless evidence was admitted in the examination of witnesses by the counsel for the defendant which could not have been introduced against his objection. That by itself alone is a matter of slight consequence. It is a not infrequent occurrence in the trial of causes, and even happens in criminal cases, that incompetent, immaterial and irrelevant evidence goes in without objection. Various motives may induce such conduct by trial counsel. In the main it is done for the supposed advantage of the client to obtain evidence which directly or indirectly may operate in his behalf. Disappointment in the substance of the evidence thus elicited, or misapprehension in its expected effect, is neither error in law nor incompetence or negligence in fact. It is difficult to reproduce on a printed page the atmosphere of a trial. The situation confronting an attorney during the examination of a witness, including information conveyed in advance from various sources, anticipation

concerning answers to be given, and judgment as to results likely to follow, is generally fraught with difficulty. Methods differ. There are divergent theories as to the wisdom of insistent conformity to every technical rule of evidence. Even tenable objections sometimes are not taken in the belief that an ultimate favorable verdict is more likely without them. * * * Experience, capacity, industry, alertness, faithfulness, learning, and character make great differences in the efficiency of different members of the bar in the trial of cases. Perfection cannot be demanded even if a standard of perfection could be formulated. All cannot be held to the same degree of excellence. Criticism after an adverse event is easy."

7, 8. The fact that counsel did not question Katie Madek to ascertain whether she was competent as a witness or not on account of her age is charged as a dereliction of duty on his part. We do not so consider it. The witness was 9 years of age, but if she was capable of receiving just impressions of the facts concerning which she testified and of relating them truly, she was competent under our statute. That she was competent in these respects seems to be indicated by the testimony of the three adult eyewitnesses to the tragedy, who received similar impressions and related them in a similar manner. If counsel was satisfied from his observations of the witness that she was competent, no duty rested upon him to object to her testifying, or to undertake an examination to test her competency. Moreover, the duty of ascertaining the capacity of a witness of tender years to testify rests primarily with the court, and if the court in this instance was satisfied from the age of the witness, her appearance on the stand and manner of testifying, that she was competent, a special examination for this purpose was unnecessary. We must presume that the court was convinced that the witness was competent.

9, 10. The testimony of the appellant elicited by the questioning of his counsel as to the marriage agreement, the amount of money he had spent on the girl and her

refusal to marry him certainly cannot be said to have
helped his case, as its tendency was to disclose a motive
for the deed. But as the state had already introduced
in evidence his statements to the officers to the same
effect, which were not denied by him, it is difficult to
see how his relation of these matters to the jury could
have prejudiced his case. It is urged that his defense
of extreme drunkenness and lack of intent in conse-
quence thereof was a wrong theory; that some other
defense was a proper one. But there is no showing that
appellant had any other defense. Cases of murder with-
out any real defense are not uncommon. If appellant
had no other defense, should his counsel be charged for
the failure of the only one available to him? Certainly
not. Moreover, defending on a wrong theory is not
evidence of incompetency. Sayre v. Commonwealth,
supra. If appellant had any true defense it was his
duty to disclose it to his counsel, and if the latter was
unwilling to present it, to appeal to the court to assign
him counsel who would. He cannot wait until after his
conviction and expect to have another trial on another
theory of defense by shifting the blame for the one
which failed upon his counsel. Sayre v. Commonwealth,
supra. While counsel for appellant may not have been
as skillful in the examination of witnesses and in the
presentation of his defense as some other attorney may
have been, it does not appear from a careful examina-
tion of the entire record that his management resulted
in an unfair trial. There is nothing in the record to
indicate that the jury was obtained, or the trial con-
cluded, with undue haste.

11. As previously stated, it appears from the record
that no objections were taken on the trial of the case
to questions which elicited evidence now claimed to have
been improper and prejudicial. The question of the
admissibility of such evidence is therefore not before
us on this appeal. This court has so held in a number
of cases, civil as well as criminal. Sharon v. Minnock,
6 Nev. 377; State v. Jones, 7 Nev. 408; State v. Murphy,

9 Nev. 394; State v. C. V. M. Co., 13 Nev. 194; State v. Lawrence, 28 Nev. 440, 82 P. 614; Karns v. State Bank & T. Co., 31 Nev. 170, 101 P. 564; State v. Williams, 31 Nev. 360, 102 P. 974; State v. Mangana, 33 Nev. 511, 112 P. 693; State v. Clarke (Nev.) 228 P. 582.

Stress is placed upon the fact that it is a capital case. The rule we have stated of not considering objections to the admissibility of evidence made for the first time on appeal has been uniformly adhered to in capital cases by this court. State v. Murphy, supra; State v. Williams, supra; State v. Mangana, supra. It is a necessary rule of procedure. Not only would it be unfair to the trial court to reverse for errors not called to its attention by a proper objection, but it would also deprive the opposite party of an opportunity to obviate the objection. Sharon v. Minnock, supra. We see no reason for a departure from the rule in this case.

12. Objection is taken to instruction No. 5 given to the jury. The instruction reads:

"There are certain kinds of murder which carry with them evidence of premeditation and deliberation. These the legislature has enumerated in the statute, and has taken upon itself the responsibility of saying that they shall be deemed and held to be murder in the first degree. These cases are of two classes: First, where the killing is perpetrated by means of poison, or lying in wait, or torture, or any other kind of willful, deliberate and premeditated killing, and here the means used is held to be evidence of premeditation and deliberation."

It is urged that the words, "and here the means used is held to be evidence of premeditation and deliberation," could have been susceptible of but one meaning to the jurors which was that the court was referring to the case on trial, and meant to tell them that the pistol used by appellant was evidence of premeditation and deliberation. We do not think that it was misleading in this respect. The court was not talking about the evidence in the case but was attempting to classify certain kinds of murder of the first degree, and the word "here" was

used to refer to the class stated. The classification, however, is not clearly drawn, for two different classes of murder of the first degree are really stated as one. But this ambiguity, occurring as it does in an abstract instruction, could not have been harmful, even if appellant's contention of its meaning to the jury were conceded. The means used in this case did tend to show deliberation and premeditation, but the jury was correctly instructed, in another instruction directly referring to the case, that deliberation and premeditation must be proven beyond all reasonable doubt before the defendant could be convicted of murder in the first degree. In regard to the evidence of drunkenness the court instructed as follows:

Instruction No. 29. "You are instructed that in order to find the defendant guilty of murder in the first degree, you must find from the evidence, beyond all reasonable doubt, that the murder was perpetrated by willful, deliberate and premeditated killing. This ingredient of deliberate premeditated killing must be clearly shown and proven beyond all reasonable doubt. It is not sufficient that you think that the killing was deliberate and premeditated, the evidence must convince you of that fact to an abiding certainty and beyond all reasonable doubt. The evidence of deliberation and premeditation must be such as to convince you that the deliberate premeditated design and purpose to murder was knowingly and intentionally formed and considered in the mind of the defendant and meditated upon before the fatal shot was fired; and, in considering whether such a design was formed in the mind of the defendant, you should consider the evidence, if any, of drunkenness. If the defendant was drunk at the time, and was too much intoxicated to form such a deliberate and premeditated purpose, he cannot be found guilty of murder in the first degree. It is true that drunkenness is no excuse for the commission of an offense, but nevertheless the jury must consider the evidence of drunkenness and determine whether it was sufficient to so cloud the mind of the

defendant as to interfere with the formation of deliberate and premeditated purpose to kill. If the drunkenness was sufficient to create a reasonable doubt in your minds as to the existence of such a deliberate premeditated purpose, you cannot find the defendant guilty of murder in the first degree."

Instruction No. 30. "You are instructed that it is a well settled rule of law that drunkenness is no excuse for the commission of a crime. Temporary insanity, produced by intoxication, does not destroy responsibility, when the party, when sane and responsible made himself voluntarily intoxicated; and drunkenness forms no defense whatever to the fact of guilt, for, when a crime, committed by a party while in a fit of intoxication, the law will not allow him to avail himself of his own gross vice, and misconduct to shelter himself from the legal consequences of such crimes, evidence of drunkenness can only be considered by the jury for the purpose of determining the degree of the crime, and for this purpose, must be received with great caution, you should discriminate between the conditions of mind merely excited by intoxicating drink yet capable of forming a specific and deliberate intent to take life, and such a prostration of the faculties as renders a man incapable of forming intent or of deliberation or premeditation. If an intoxicated person has the capacity to form the intent to take life, and conceives and executes such intent, it is no ground for reducing the degree of his crime that he was intoxicated to conceive it, or to conceive it more suddenly by reason of his intoxication."

13. Exception is taken to instruction No. 30, wherein the court said that evidence of drunkenness "must be received with great caution." The two instructions together correctly state the law on this phase of the case. In the case of State v. Johnny, 29 Nev. 203, 87 P. 3, practically the same instructions were given and approved by this court, in which the jury was twice told that evidence of drunkenness should be received with great caution. See, also, State v. Thompson, 12

Nev. 140, in which an instruction was approved which stated that:

"Evidence of drunkenness can only be considered by the jury for the purpose of determining the degree of the crime, and for this purpose it must be received with caution."

14. It is a general rule that in cases of homicide evidence of drunkenness should be received with caution. 29 C. J. p. 1061; State v. Hawkins, 23 Wash. 289, 63 P. 258; People v. Vincent, 95 Cal. 425, 30 P. 581; People v. Calton, 5 Utah, 451, 16 P. 902; U. S. v. Meagher (C. C.) 37 F. 875.

15. When evidence is of such character that its weight may be easily misjudged it is proper ffor the court to advise that it should be received with great caution. State v. Streeter, 20 Nev. 403, 22 P. 758. This does not mean that it is not entitled to credit even if believed, but merely that it should be weighed with care.

Counsel for appellant in the court below filed an opening brief, in which he assigned certain errors, which we have considered and find to be without merit. Counsel who have displaced him on this appeal concede that his contentions are untenable.

As there is no prejudicial error in the record, the judgment and order appealed from are affirmed, and the district court is directed to make the proper order for the carrying into effect by the warden of the state prison the judgment rendered.

### On Petition for Rehearing

April 7, 1926.

*Per Curiam:*

Rehearing denied.